**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| S.P.S., *ex rel.* SHORT, *et al.*<br><br>　　*Plaintiffs,*<br><br>　　v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>　　*Defendants.* | CIVIL ACTION<br><br>FILE NO. 1:19-CV-04960-AT |

## DEFENDANTS'[1] RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

In 1964, the Georgia General Assembly first passed a statute assigning

the method of determining the order of political parties on the ballot:

> The names of candidates who are nominees of a political party shall be placed under the name of their party. The columns of political parties shall be printed on the ballot, beginning on the left side thereof, and **shall be arranged from left to right in the descending order of the totals of votes cast for candidates of the political parties for Governor at the last gubernatorial election**. The columns of parties, having no candidate for Governor on the ballot at the last gubernatorial election, shall be arranged alphabetically, according to the party name, to the right of the columns of the parties so represented.

---

[1] Secretary of State Brad Raffensperger and State Election Board Members David J. Worley, Rebecca N. Sullivan, Anh Le, and Seth Harp.

1964 GA. LAWS 99 (emphasis added). That language remains unchanged in Georgia law at O.C.G.A. § 21-2-285(c) (the "Ballot-Order Statute"). After 55 years (and more than a dozen gubernatorial elections), a group of plaintiffs[2] argue that this non-discriminatory method of determining ballot order, which has featured candidates from both major political parties in Georgia[3] in the first position of the ballot at various times, is unconstitutional.

Injunctive relief is not appropriate at this early stage, with a thin, one-sided factual record and when the next general election is almost a year away. The Court should allow the parties time to develop Georgia-specific facts and analysis instead of merely saying "us too" to a Florida district-court ruling that was decided on a different factual record and is currently on appeal. (Additionally, it is entirely possible the Eleventh Circuit, in the

---

[2] Plaintiffs are a soon-to-be Democratic voter, a Democratic-leaning voter, Democratic-party organizations, and a progressive organization. [Doc. 1, ¶¶ 15-21]. They are collectively referred to as "Plaintiffs" in this brief.
[3] Georgia apparently did not have a ballot-order statute prior to 1964 because it did not need one—the 1966 election was the first election after Reconstruction where a Republican candidate for Governor was on the general-election ballot. Then-Congressman Bo Callaway (R) received more total votes than Lester Maddox (D) despite being listed second on the ballot, but a write-in campaign for Ellis Arnall prevented any candidate from getting a majority and the Georgia General Assembly selected Maddox as the Governor. *See* Harold Paul Henderson, *Gubernatorial Election of 1966*, https://www.georgiaencyclopedia.org/articles/government-politics/gubernatorial-election-1966 (last visited December 19, 2019).

Florida case on appeal before it, rules on the exact issues before this Court on an expedited basis.) Even in the Florida district court case on which Plaintiffs so heavily rely, the court refused to issue a preliminary injunction, as have other district courts facing similar challenges.

Preliminary relief is particularly inappropriate because Plaintiffs' claims of voter dilution present a nonjusticiable political question. Plaintiffs' experts claim that the ballot order alone confers a *four-percent benefit* to candidates in partisan elections in Georgia [Doc. 23, p. 6], which would mean that 156,000 Georgians chose between Governor Brian Kemp and former Rep. Stacey Abrams in the high-profile 2018 election based solely on the order in which they appeared on the ballot. Even assuming voters did choose to freely exercise their vote based upon this criteria, it is not the role of a court to look into the reasons behind a given vote and determine whether such a reason is valid. Indeed, the U.S. Supreme Court has found questions of partisan advantage analysis nonjusticiable in the context of partisan gerrymandering precisely because it does not lend itself to judicial resolution. This Court should decline the invitation to decide this case on a preliminary-injunction record and instead allow this case to follow the normal rules of discovery and litigation, including allowing the Defendants to explore the legitimacy and extent of the primacy effect Plaintiffs' experts claim exists.

3

## STATEMENT OF FACTS

### I.   Methods of determining ballot order.

States use a variety of methods for determining the order of political parties on general-election ballots. Georgia is one of many states that uses a system based on the number of votes for particular offices to assign the ballot order of political parties.[4] Other methods used by states include assigning Democrats to be first,[5] drawing lots to determine the ballot order,[6] or requiring all parties to be listed alphabetically.[7]

Georgia's system uses a high-profile, highly publicized, partisan election to determine which party's candidates will be listed first. Every four years, the voters determine which party will have its candidates listed first on the next general election ballot. For the first 38 years of its use, the Ballot-Order Statute resulted in Democrats being listed first on the ballot in

---

[4] *See* Ariz. Rev. Stat. § 16-502 (votes cast for governor); Conn. Gen. Stat. § 9-249a (votes cast for governor); Ind. Code Ann. § 3-11-2-6(a) (Burns) (votes cast for secretary of state); Mich. Comp. Laws Serv. § 168.703 (votes cast for secretary of state); Minn. Stat. Ann. § 204D.13 (total votes cast in state for party); Mo. Rev. Stat. § 115.239 (votes cast for governor); N.Y. Elec. Law § 7-116 (party of the governor); Tex. Elec. Code § 52.091 (votes cast for governor); Wash. Rev. Code Ann. § 29A.36.161(4) (votes cast for president); Wis. Stat. Ann. § 5.64(1)(es) (votes cast for governor); Wyo. Stat. Ann. § 22-6-121(a) (votes cast for member of Congress).
[5] Del. Code Ann. tit. 15, § 4502(a)(5).
[6] *E.g.*, Cal. Elec. Code § 13112 (Deering).
[7] *E.g.*, Haw. Rev. Stat. Ann. § 11-115 (LexisNexis).

Georgia.[8] Since the 2002 gubernatorial election, Republicans have been listed first on the ballot. In 2018, Democrats came within 1.39 percentage points of again being listed first on the ballot. [Doc. 23, p. 8].

## II.  The evidence for the existence of a primacy effect in partisan elections is not as overwhelming as Plaintiffs claim.

Plaintiffs believe that voters favor candidates who are listed first, which they refer to as the "primacy effect" or "position bias." [Doc. 23, pp. 8-9]. But while the evidence shows this effect in non-partisan elections, the primacy effect *in partisan elections* is far from "well-accepted," as Plaintiffs wish this Court to believe. Plaintiffs' own experts confirm that the "primacy effect" is most easily observed in non-partisan elections and that name order effects are stronger when candidate party affiliations are not listed. [Doc. 24-3, p. 47]. However, the statute they challenge applies **only** to partisan elections; non-partisan elections and primaries use alphabetical order to determine the placement of candidate names. O.C.G.A. § 21-2-285(c).

The "long line of cases" cited by Plaintiffs were primarily considering incumbent-first statutes or statutes that never allowed any change in

---

[8] With the possible exception of the 1970 Governor's election, which Defendants have not yet been able to determine.

positioning.[9] Other courts have recognized significant disagreement on voter behavior as a result of ballot ordering. *See, e.g., Green Party of Tenn. v. Hargett*, 767 F.3d 533, 551 (6th Cir. 2014). Indeed, far from the monolithic agreement among courts Plaintiffs suggest, numerous courts have expressed skepticism regarding the effects of so-called ballot "position bias":

> The existence and degree of the "windfall-vote phenomenon" that underlies the asserted "positional advantage" theory is ***highly debated and subject to a multitude of confounding variables***. See *Clough*, 416 F. Supp. at 1063 ("A number of written studies . . . purpor[t] to demonstrate the effects of the designation of first position on the outcome of elections. ***Some of them support, and some contradict, plaintiff's factual premise.***"); *New Alliance Party v. New York State Bd. of*

[9] *McLain v. Meier*, 637 F.2d 1159, 1166 n.15 (8th Cir. 1980) (recognizing studies which question positional bias while considering **incumbent-first statute**); *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (upholding district-court finding of intentional discrimination due to **no opportunity** for other political party to be listed first in individual counties); *Graves v. McElderry*, 946 F. Supp. 1569, 1575 (W.D. Okla. 1996) (recognizing disagreement in amount of position bias in highly publicized, partisan elections when reviewing **statute that required Democrats to always be listed first**); *Akins v. Sec'y of State*, 154 N.H. 67, 71, 904 A.2d 702, 706 (2006) (state did not appeal trial-court finding of primacy effect and statute was unconstitutional under unique New Hampshire constitutional provision); *Gould v. Grubb*, 14 Cal. 3d 661, 676, 122 Cal. Rptr. 377, 387, 536 P.2d 1337, 1347 (1975) (reviewing incumbent-first ballot order ordinance); *State ex rel. Roof v. Bd. of Comm'rs*, 39 Ohio St. 2d 130, 136, 314 N.E.2d 172, 177 (1974) (reviewing provision of Ohio Constitution requiring rotation of candidate names on new voting machines); *Kautenburger v. Jackson*, 85 Ariz. 128, 131, 333 P.2d 293, 295 (1958) (violation of Arizona constitution to rotate candidate names on paper ballots but not on voting machines); *Elliott v. Sec'y of State*, 295 Mich. 245, 250, 294 N.W. 171, 173 (1940) (requiring rotation of names in nonpartisan judicial races).

*Elections*, 861 F. Supp. 282, 288-90 (S.D.N.Y. 1994) (discussing the effect of incumbency, party affiliation, and race visibility on positional bias).

*Sarvis v. Judd,* 80 F. Supp. 3d 692, 700 (E.D. Va. 2015) (emphasis added).

Plaintiffs even acknowledge that their position requires more "modern research" than was ultimately relied on by the district court in Florida.[10] [Doc. 23, p. 10]. In other words, the ability to even attempt to evaluate the primacy effect in partisan elections is recent and primarily the work of Plaintiffs' expert. *See* [Doc. 24-3, p. 6 n.1, pp. 14-21].

The study by Dr. Rodden is apparently the first study related to Georgia elections and obviously took months to assemble. [Doc. 24-2]. In order to effectively test Dr. Rodden's work, Defendants will require time to

---

[10] Contrary to Plaintiffs' claim, there is not uniform consensus regarding the extent of ballot primacy effect among political scientists. Other studies have found that the effects are negligible in partisan general elections. *See, e.g.,* Daniel E. Ho and Kosuke Imai, *Estimating Causal Effects of Ballot Order From a Randomized Natural Experiment*, PUBLIC OPINION QUARTERLY, Vol. II, No. 2, Summer 2008, at 216-240 (analyzing primacy effect in California following its adoption of randomized ballot order and finding that ballot order impacts minor party candidates but effects for major party candidates in general elections were negligible); R. Michael Alvarez, Betsy Sinclair, and Richard L. Hasen, *How Much is Enough? The "Ballot Order Effect" and the Use of Social Science Research in Election Law Disputes*, ELECTION LAW JOURNAL 5(1):40-56 ("Courts are not particularly well equipped to make a decision about whether to order randomization and rotation in the face of incomplete evidence on both the need for a change in existing ballot order law and a state's interest in the change.").

conduct discovery, consult with other experts, and prepare a sufficient response. There is simply no need to rush a decision on the merits at the preliminary-injunction stage, particularly in light of Plaintiffs' acknowledgment that more "modern" research is required on this issue.

### III.   Plaintiffs have not proposed a reasonable remedy to their alleged harm.

In their Complaint, Plaintiffs do not offer any potential remedy to the alleged harm they claim to have sustained due to the primacy effect. Instead, they simply wish to be the beneficiaries of it on a more regular basis. They do not suggest every candidate should be granted a favorable ballot position, just that the "similarly-situated major party candidates" have an "equal opportunity to be listed first on the ballot." [Doc. 1, p. 26]. This admission by Plaintiffs demonstrates that the goal of this lawsuit is to ensure they are beneficiaries of the supposed primacy effect more regularly. Further, it implies that any changes to the allegedly unconstitutional ballot ordering system would be constitutional so long as they equally benefit Democrats and Republicans, even if that benefit is to the exclusion of independents and lesser-known political parties. They fail to explain why this Court should favor major-party candidates over others.

**IV.** **Georgia's new voting system was not certified for ballot rotation, and the re-certification process would be costly and time-consuming.**

Plaintiffs note that the Dominion voting system "has the built-in capability to rotate names on the ballot." [Doc. 23, p. 24]. Plaintiffs correctly note that Dominion's ImageCast X ballot-marking devices ("BMDs") have the capability of performing standard ballot rotation. Declaration of Michael Frontera ("Frontera Dec."), attached as Ex. A, at ¶ 4. This is a significant advantage of BMDs over hand-marked paper ballots. *Id.* at ¶ 5. However, the rotation Plaintiffs seek, which would rotate only major party candidates and would likely require precinct-by-precinct rotation, is not "standard" ballot rotation. Precinct-by-precinct rotation would require additional ballot styles for each county, and the BMDs are not certified to generate complete randomization of candidate names. *Id* at ¶¶ 5, 8.

While standard ballot rotation is an available feature of the Dominion BMDs, Georgia has not state-certified that component because it was not required by Georgia law at the time Georgia contracted with Dominion. *Id.* at ¶ 6. If ballot rotation was required by Georgia law or this Court, it would require recertification, and an addition of new features would likely come at an additional, unexpected, and unbudgeted cost. *Id.* at ¶ 7. Further, it will add significant degrees of difficulty to the ongoing implementation of

Georgia's new voting machines, making implementation more challenging at a highly inopportune time. *Id.* at ¶¶ 9-10.

## ARGUMENT AND CITATION TO AUTHORITY

Even if we assume Plaintiffs are correct about the existence of a primacy effect in partisan elections, the larger questions facing this Court are (1) whether it is constitutionally problematic and; (2) if so, what can the judicial branch do, if anything, to remedy it. As sports leagues have learned, attempting to remove competitive advantages from a supposedly neutral process is not simple.[11] This Court should not rush into the determinations Plaintiffs seek, but (assuming for the purposes of argument that the Court find Plaintiffs' claims to be justiciable and not subject to dismissal outright) should instead allow this case to proceed on a normal course of discovery to evaluate the nature and extent of a primacy effect in Georgia, if any; whether any supposed effect can be ameliorated; what burden and cost would be borne by the State in the event it must change its ballot order system; and whether the Court, rather than the legislature, should make those determinations.

---

[11] For example, in NFL football, the team that wins the coin toss (a chance event) at the beginning of overtime is 9.6 percent more likely to win the game. Rodger Sherman, *The NFL's Overtime Rules Aren't Fair – But Neither Are the Alternatives*, https://www.theringer.com/2017/2/6/16042116/nfl-overtime-rules-super-bowl-li-patriots-falcons-62316a6f8e3c (Feb. 6, 2017).

## I.       Standard of review.

To obtain preliminary-injunctive relief, the moving party must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest, and, in the Eleventh Circuit, clearly establish the four prerequisites. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations omitted); *ACLU of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F. 3d 1177, 1193–94 (11th Cir. 2009).

The extraordinary nature of the relief sought by Plaintiffs is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S. Ct. 1184 (2008).

## II.      Plaintiffs are unlikely to succeed on the merits.

### A.      *Partisan vote dilution claims regarding ballot order are not justiciable.*

As the U.S. Supreme Court recognized earlier this year, federal courts "have no commission to allocate political power and influence in the absence

11

of a constitutional directive or legal standards to guide us in the exercise of such authority." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019). *Rucho* dealt with claims about the allocation of political power through partisan gerrymandering—as opposed to partisan ballot ordering—but its logic is highly instructive here.

The arguments made by the plaintiffs in *Rucho* bear a strong resemblance to the arguments Plaintiffs make in this case, and this Court should follow the Supreme Court's lead by exercising restraint when presented with the opportunity to pass judgment on issues over which it has no constitutional authority. "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.' We have understood that limitation to mean that federal courts can address only questions 'historically viewed as capable of resolution through the judicial process.'" *Id.* at 2493–94. This limiting principle is based on the foundational notion that the courts, knowledgeable though they may be, are ill equipped to pass judgment on the elastic and ever-changing realms referred to as "political questions."

With due respect for the maxim that it is "inherently the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), the Supreme Court cautioned that, "[s]ometimes, however, the law is that the judicial department has no business entertaining

the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho,* 139 S.Ct. at 2494 (internal quotations and citations omitted). Particularly relevant in determining whether a claim amounts to a nonjusticiable political question is whether there is "a lack of judicially discoverable and manageable standards for resolving it." *Id.* at 2496.

The dearth of judicially discoverable and manageable standards for resolving Plaintiffs' partisan claims are readily apparent here, and the *Rucho* court again provides useful guidance. There, the plaintiffs argued that because the federal courts "can adjudicate one-person, one-vote claims, [they] can also assess partisan gerrymandering claims," but the Supreme Court distinguished the two situations. *Id.* at 2501. "[T]he one-person, one-vote rule is relatively easy to administer as a matter of math" because it is grounded in the notion that "each representative must be accountable to (approximately) the same number of constituents." *Id.* Partisan vote dilution, by contrast, relies on statistical guesses and the faulty premise that political parties are everlasting and unchanging both in their makeup and in their political objectives. The Supreme Court aptly characterized the problem partisan politics introduces when courts attempt to craft "manageable standards" with respect to political questions:

13

> Voters elect individual candidates in individual districts, and
> their selections depend on the issues that matter to them, the
> quality of the candidates, the tone of the candidates' campaigns,
> the performance of an incumbent, national events or local issues
> that drive voter turnout, and other considerations. Many voters
> split their tickets. Others never register with a political party,
> and vote for candidates from both major parties at different
> points during their lifetimes.

*Id.* at 2503. This reality, the court warned, "risks basing constitutional

holdings on unstable ground outside judicial expertise." *Id.* at 2504. For

similar reasons, this Court should decline Plaintiffs' invitation to engage in

the dubious practice of statistical prognostication with respect to otherwise-

neutral partisan ballot ordering. That is why at least one district court

concluded, "While access to the ballot may, at times, be afforded

constitutional protection, access to a *preferred position* on the ballot so that

one has an equal chance of attracting the windfall vote is not a constitutional

concern." *New Alliance Party*, 861 F. Supp. at 295 (emphasis added).

Another district court applied the "one person, one vote" analogy

employed in *Rucho* directly to a ballot ordering challenge. *Sarvis,* 80 F. Supp.

3d at 700. In *Sarvis,* the court found the plaintiffs' claims regarding the

primacy effect particularly dubious because such claims are predicated "upon

the troubling notion that 'windfall' votes are meaningless compared to 'real'

votes and thereby dilute the impact of votes cast by more 'thoughtful' or

'informed' voters." *Id.* Contrasting ballot positioning with constitutionally problematic cases that run afoul of the maxim of "one person, one vote," the *Sarvis* court was particularly concerned that ballot positioning cases require a court to look into the *reasons* behind a given vote and then determine whether such a reason is valid:

> It is worth remembering that the "windfall vote" is not just a statistical anomaly of the social sciences; it represents individuals who went to the polls and cast ballots in a constitutionally protected exercise of their democratic rights. And, "an irrational vote is just as much of a vote as a rational one."

*Id.,* citing *New Alliance Party,* 861 F. Supp. at 297. *See also Sarvis v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016); *Green Party of Tenn. v. Hargett*, 2017 U.S. App. LEXIS 18270, at *16 (6th Cir. May 11, 2017); *Meyer v. Texas*, 2011 U.S. Dist. LEXIS 50325, at *16-20 (S.D. Tex. May 11, 2011).

Put differently, Plaintiffs here are not concerned with ensuring "one person, one vote"—rather, they only claim "irreparable harm through the ***systemic dilution of their voting power*** absent an injunction." [Doc. 23, p. 26] (emphasis added). In other words, they seem bothered by the fact that what they see as irrational votes carry the same value as votes they deem properly cast. And they now seek to have this Court endorse their view that "unthoughtful" votes are not constitutionally protected to the extent Plaintiffs

are not sufficiently benefiting from them. But "[i]f candidates want the votes of uninformed voters, they should inform them." *Sarvis,* 80 F. Supp. at 700.

Plaintiffs' claims are not justiciable, do not warrant a preliminary injunction and are better suited for change via the political branches.

B.     *Georgia's ballot-order statute satisfies* Anderson/Burdick.

As stated above, states—including the State of Georgia—retain constitutional and regulatory authority to ensure the integrity and efficiency of elections. U.S. Const. Art I, § 4, cl. 1; *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). "[T]he framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). This leeway extends specifically to the selection of balloting systems. *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003) ("[I]t is the job for democratically elected representatives to weigh the pros and cons of various balloting systems," not the federal courts.); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (voters do not have an absolute right to vote in any way they choose).

The evaluation of voting regulations under a fundamental-right-to-vote claim takes place under a sliding scale, which considers the alleged burden

on the right to vote against the interest of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

Plaintiffs claim there is a "restriction" when there is no restriction at all. Instead, there is a facially neutral statutory procedure for ballot positioning that does not favor incumbency and applies to all candidates regardless of party affiliation. Through the enactment of O.C.G.A. § 21-2-285(c) over fifty years ago, the State of Georgia made a policy decision about how to position candidates on a ballot where one candidate must always and necessarily be positioned first on that ballot. The result of that decision is that the political party that won the most voters in the prior gubernatorial race, *whichever party that may be,* would be in first position.

Plaintiffs improperly analogize this to cases in which courts struck down statutes requiring the incumbent to always be placed first on the ballot. But that is not what occurs in Georgia's Ballot-Order Statute. Indeed, depending on the particular race, the incumbent may well be of a different political party than the Governor and therefore be relegated to a lower spot

on the ballot. Moreover, while the Governor's party has also been the majority party in the legislature in the past few election cycles, that is not always the case and it need not be the case going forward.

As Plaintiffs point out, Ms. Abrams lost the election by 1.39 percentage points. But for the "vanishingly small" margin of victory enjoyed by Governor Kemp, it would be Democrats, not Republicans at the top of the ballot in 2020 and 2022. Thus the Ballot-Order Statute would have provided the current minority party what Plaintiffs claim is the advantage of the so-called primacy effect. Setting aside whether a group of Democratic and progressive plaintiffs would have filed this lawsuit if Ms. Abrams won, Plaintiffs do not request any specific remedy from this Court that might eliminate the so-called primacy effect. Far from removing the primacy effect, Plaintiffs appear to simply want to benefit from it at the expense of minor parties. But it is not for this Court or any other to allocate political power. *Rucho,* 139 S. Ct. at 2508. That task is reserved to the voters and their representatives. If Plaintiffs wish to change the Ballot-Order Statute, the legislative process is the proper venue—not this Court and certainly not a preliminary injunction.

Since this case involves facially nondiscriminatory restrictions and the state's inherent authority to control its elections, any review conducted by this Court must be under a rational basis standard. *Timmons*, 520 U.S. at

358. The State of Georgia selected a facially nondiscriminatory method of choosing who goes first. In opting to place the party of the most recently elected governor first, the state made the choice that utilizing the most visible statewide race would ensure the lowest degree of voter confusion. It is also the state race that voters are most likely to cast a vote in when they go to the polls, ensuring the most meaningful participation by the population in selecting subsequent ballot order. Indeed, because the governor's race attracts the most attention and is the least likely race on the ballot to fall victim to the primacy effect,[12] it is uniquely positioned to ensure that the primacy effect itself does not contribute to who appears first on the ballot. Far from favoritism of the "governing party's dominance," the Ballot-Order Statute in many ways can assist the minority party.

## III.   Plaintiffs cannot show an urgent need for a preliminary injunction.

    *A.    There is no irreparable harm because the first alleged harm is almost a year away.*

Plaintiffs filed this Motion claiming that, "[u]nless the Ballot Order Statute is enjoined, Plaintiffs will suffer severe and irreparable harm in the

---

[12] *See, e.g., New Alliance Party,* 861 F. Supp. at 289 ("Even those experts… who found position bias in most elections, would not go so far as to state that it existed in presidential or gubernatorial elections.")

2020 election." [Doc. 23, p. 25]. When analyzing a nearly identical statute, the *Jacobson* court denied a motion for preliminary injunction, noting the lack of irreparable harm. *Jacobson v. Detzner*, Case No. 4:18-CV-262-MW/CAS, slip op. at 3 (N. D. Fla. July 24, 2018), attached as Ex. B. Georgia's Ballot-Order Statute has been in effect for 55 years and Plaintiffs only now challenge its application.[13] Not exercising reasonable diligence argues in favor of a lack of irreparable harm. *Id*.; *Benisek v. Lamone*, 138 S.Ct. 1942, 1944 (2018).

   In addition to failing to act diligently, Plaintiffs put forth confusing and conflicting explanations as to why they seek a *preliminary* injunction handed down by this Court as opposed to a full trial on the merits. Plaintiffs first acknowledge that, to the extent they are suffering an injury, it is only "*once the election has come and gone,* [that] those serious injuries to Plaintiffs cannot be 'undone through monetary remedies.'" [Doc. 23, p. 26]. Immediately following this statement, though, Plaintiffs claim to be irreparably harmed because "every day that the Ballot Statute is in force" it is "necessarily influencing political strategy…" *Id.*

---

[13] Indeed, many of the same plaintiffs in this case were plaintiffs in the Florida litigation, filed well over a year prior to the initiation of this litigation.

Putting aside whether influencing the political strategy of political organizations constitutes an irreparable injury, the next election in which the Ballot-Order Statute will be used is nearly a year away. Rather than entering a ruling based upon generalized assumptions, or relying upon evidence from cases that drew conclusions about other states that might not prove true in Georgia, the Court should ensure that it has the ability to consider a fully developed record before deciding to overturn a law that has been in place for more than half a century. Accordingly, there is adequate time for this Court to develop a more robust record before ruling on Plaintiffs' claims and allowing the Court to do so does not in any way harm Plaintiffs, much less cause them irreparable harm.  Rushing to judgment may very well cause the very harm Plaintiffs seek to avoid.

B.    *The equities and public interest favor Defendants.*

Plaintiffs waited to file this lawsuit until Georgia's rollout of its new voting system was well underway. Had they persuaded the legislature or filed this lawsuit earlier, it is possible that their preferred ballot-rotation could have been included as part of the process for purchasing a new voting system. Frontera Dec. at ¶ 7. Given the significant cost to the state to add new capabilities to an already-complicated rollout of a new system, the equities cannot favor Plaintiffs. *Benisek*, 138 S.Ct. at 1944.

Further, while Plaintiffs trumpet the *Jacobson* decision as the roadmap for this Court, they fail to point out that the case is currently being appealed to the Eleventh Circuit, which will ultimately decide a case on a similar statute. *See Jacobson v. Florida Secretary of State*, Appeal No. 19-14552 (motion for stay pending appeal before Eleventh Circuit). Given the fact the Eleventh Circuit will soon rule on the same issues raised by Plaintiffs; the challenges associated with the rollout of the new voting system, Frontera Dec. at ¶¶ 9-10; and the lack of urgency to decide this case before the opportunity to develop a record, the equities and public interest favor Defendants and this Court should deny Plaintiffs' motion. *Benisek*, 138 S. Ct. at 1945 (upholding decision denying injunction to wait for firmer guidance from higher court).

## IV.   Plaintiffs lack standing.

A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992). *See also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001). Article III standing requires that each claim "clearly" establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)). To do so, Plaintiffs must allege sufficient facts to demonstrate a "[1] concrete, particularized, and

actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743, 2752 (2010).

A. *The organizational Plaintiffs have not pleaded an injury because they are fulfilling their mission.*

Plaintiffs DNC, DSCC, DCCC, DPG, and Priorities USA have not adequately pleaded an injury. All cite frustration of their mission of electing Democrats and/or progressives as a basis of standing. [Doc. 1, ¶¶ 17-21]. But an injury must constitute more than a "setback to the organization's abstract social interests." *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982). Standing is not established when the alleged harm that befalls an organization is to act consistently with its existing mission. This includes plaintiffs that engage in advocacy efforts. *Int'l Acad. of Oral Med. & Toxicology v. Food & Drug Admin.*, 195 F. Supp. 3d 243, 256 (D. D.C. 2016). Essentially, the organizational plaintiffs claim they will have to spend money to further their mission, but to spend that money slightly differently. But to have standing, organizational plaintiffs must show that Defendants' allegedly "illegal acts *impaired* the organization's ability to engage in its *own projects* by forcing the organization to *divert resources in response*." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014) (emphasis added). The

23

organizational plaintiffs will continue their work to elect Democrats—while they claim to be diverting resources, they are simply making different decisions about spending money in furtherance of their purpose, not diverting funds to a wholly new mission. As the Eleventh Circuit pointed out, a true diversion is from the organization's "own projects," *id*., and merely alleging that the organization will continue to spend the same funds for the same purposes cannot be a diversion of resources for purposes of standing.

      B.     *The individual Plaintiffs lack standing because they cannot show a harm traceable to and redressable by Defendants and the organizational Plaintiffs cannot show associational standing for the same reason.*

Individual Plaintiffs SPS and Edwin Prior claim their votes will be diluted by the Ballot-Order Statute. [Doc. 1, ¶¶ 15-16]. Organizational Plaintiffs also raise associational standing on behalf of their members. [Doc. 1, ¶¶ 17-21]. But the only injury they assert is a group injury: that overall Democratic votes will be diluted because of the decisions of not-well-informed voters. That type of injury is not traceable to the Ballot-Order Statute or redressable by this Court because it depends on the acts of third parties— voters who vote based on ballot positioning instead of on an informed basis. *See Lewis v. Governor of Ala.*, No. 17-11009, 2019 U.S. App. LEXIS 36857, at *34 (11th Cir. Dec. 13, 2019) (rejecting claims based on lack of redressability

and traceability). If Plaintiffs succeed in asking this Court to change the Ballot-Order Statute, they ultimately will still be subject to the primacy effect. That means Plaintiffs cannot "obtain relief that directly redresses the injury suffered," *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010), and lack standing a result.

## CONCLUSION

In sum, Plaintiffs' claims are not justiciable because they require this Court to be involved in the minutiae of determining partisan advantage, and Plaintiffs lack standing. Additionally, Plaintiffs have not met the standards for a preliminary injunction: Plaintiffs are not likely to succeed on the merits of their claim that Georgia's Ballot-Order Statute fails rational-basis review. Plaintiffs have failed to show irreparable harm, after having waited decades to file their challenge. And finally, significant damage would result if the Court requires the State to add costly and time-consuming changes to Georgia's new voting system as it is being implemented statewide for the first time. Accordingly, this Court should deny the motion for preliminary injunction and allow this case to continue on the normal course of litigation.

Respectfully submitted this 20th day of December, 2019.

STATE LAW DEPARTMENT
Christopher M. Carr

Attorney General
Georgia Bar No. 112505
Annette M. Cowart
Deputy Attorney General
Georgia Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
Office of the Georgia Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the

foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'

MOTION FOR PRELIMINARY INJUNCTION has been prepared in Century

Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson