## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

S.P.S., *ex rel.* SHORT, *et al.*

    *Plaintiffs*,

v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:19-CV-04960-AT

## DEFENDANTS'[1] BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

## INTRODUCTION

The statute setting the order of political parties on Georgia ballots has been law since 1964. O.C.G.A. § 21-2-285(c) (the "Ballot-Order Statute"). Fifty-five years later, Plaintiffs' First Amended Complaint [Doc. 17] (the "Complaint") asks this Court to determine questions that relate solely to partisan advantage—whether there is a benefit to partisan candidates[2] by being listed first and, if so, whether that benefit provides too much advantage to one political party over the other.

---

[1] Secretary of State Brad Raffensperger and State Election Board Members David J. Worley, Rebecca N. Sullivan, Anh Le, and Seth Harp.
[2] Plaintiffs do not challenge ballot placement of candidates in non-partisan elections, which is arranged alphabetically. O.C.G.A. § 21-2-285(c).

This Court should decline to answer these questions. *First*, Plaintiffs lack standing. The only individuals with standing to challenge the Ballot-Order Statute are candidates. None of the individual voters allege they are a candidate and the organizations only purport to have associational standing based on voter members, not candidates. Further, none of the organizations have alleged a sufficient diversion of resources: they allege they will be spending money in Georgia as a "battleground state" regardless of the Ballot-Order Statute. *Second*, the questions of partisan advantage raised in Plaintiffs' Complaint are inherently political and thus not appropriate for resolution by a court. Plaintiffs have not stated a claim for vote dilution because they assert only a group harm, claiming that uninformed voters will cancel out their informed votes—not that they are unable to vote. *Third*, Plaintiffs' unreasonable and prejudicial delay should count against them for purposes of laches.

## ARGUMENT AND CITATION OF AUTHORITY[3]

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate

---

[3] Defendants also incorporate the legal arguments in their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. [Doc. 34].

"more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678-79.

A complaint must also be dismissed under Fed. R. Civ. P. 12(b)(1) if it has not alleged a sufficient basis for subject-matter jurisdiction. *Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

## I.   Plaintiffs lack standing to bring this action.

A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992). *See also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001). Article III standing requires that each claim "clearly" establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)). Plaintiffs must demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

### A.   *The Individual Plaintiffs lack standing.*

Plaintiffs S.P.S. *ex rel.* Natalie Short ("S.P.S.") and Edwin Prior ("Prior"), Aileen Nakamura ("Nakamura"), and Angie Jones ("Jones") (the

"Individual Plaintiffs") are individuals residing in Georgia. [Doc. 17, ¶¶ 15-18]. S.P.S. is a member of the Democratic Party who plans to vote for Democratic Party candidates in the upcoming November 2020 general election. *Id.*, ¶15. Prior considers himself to be a Democratic-leaning independent, Nakamura and Jones consider themselves Democrats, and all plan to vote for the Democratic Party candidates. *Id.*, ¶16-18.

The Individual Plaintiffs have not alleged any injury to their individual right to vote traceable to the Ballot-Order Statute. While Plaintiffs rely heavily on *Mann v. Powell*, 333 F. Supp. 1261 (N.D.Ill. 1969), *aff'd* 398 U.S. 955 (1970), they choose to ignore that court's determination about individual-voter standing in cases about ballot order. In *Mann*, plaintiff Bernard Weisberg was, like the Individual Plaintiffs, a voter whose preferred candidate might not be first on the ballot. He claimed that his right to vote was burdened or that his vote would be diluted if candidates he opposed received a "windfall vote." 333 F. Supp. at 1265. The court rejected these claims, saying, "We have found no cases in which a cause of action for a voter was stated on the basis of such an attenuated personal interest." *Id*.

Distinguishing cases in which racial gerrymandering and other laws harmed voters' ability to have their votes cast or counted, the court said:

> [P]laintiff merely alleges that discriminatory state action may cause other voters to act irrationally. We think this is an insufficient personal interest to state a cause of action and, although injury to candidates as a result of such action may be severe, we will not permit this plaintiff to maintain this action on behalf of candidates in the primary election.

333 F. Supp. at 1265 (citing *Tileston v. Ullman,* 318 U.S. 44 (1943)). While allocating ballot order to one candidate might harm that *candidate's* political opponent, no harm befalls the individual voters themselves, whose ability to vote for the candidate of their choice remains unaffected.

     *B.    The Organizational Plaintiffs lack standing.*

     Plaintiffs DNC Services Corp. d/b/a Democratic National Committee ("DNC"), DSCC, DCCC, Democratic Party of Georgia ("DPG") and Priorities USA (collectively, the "Organizational Plaintiffs") have claimed that they have standing under a diversion-of-resources theory, while Plaintiffs DNC and DPG also appear to allege that they have associational standing. But neither of these theories support a claim of standing by the Organizational Plaintiffs and their claims must be dismissed.

     1.    <u>The Organizational Plaintiffs have not alleged a sufficient diversion of resources to constitute an injury.</u>

     To sufficiently divert resources for purposes of standing, an organizational plaintiff must allege a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's

resources – [that] constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). If a complaint contains only "generic and abstract" allegations of injury, the complaint must be dismissed for lack of standing. *In re Equifax, Inc.*, 371 F. Supp. 3d 1150, 1165-1166 (N.D. Ga. 2019).

The Organizational Plaintiffs have made only generic and abstract allegations that their resources will be diverted as a result of the Ballot-Order Statute. The vague assertion that the Ballot-Order Statute will cause the Organizational Plaintiffs to "increase their efforts" in Georgia "at the expense of its efforts in other states," *see, e.g.,* [Doc. 17, ¶¶ 19-23][4], does not rise to the level of a concrete and demonstrable injury. Further, the idea that the Organizational Plaintiffs would redirect support from Georgia back to other states is directly undercut by the lengths that Plaintiffs go to persuade the Court that Georgia is already a hotly contested battleground state. It is hard to imagine that Organizational Plaintiffs will reduce support in Georgia if candidates receive more favorable ballot positions, given that Georgia races are "exceedingly close elections in every recent major election cycle," [Doc. 17, ¶ 35], and that there are likely to be "even more highly competitive races in

---

[4] Plaintiff DPG does not make this claim, as it operates only in Georgia.

Georgia in 2020." [Doc. 17, ¶ 37]. Surely the Organizational Plaintiffs will continue to make every effort to win Georgia elections, even if the ballot order changes, especially since they view Georgia's Senate seats as "political 'toss ups'" [Doc. 17, ¶ 37] and that they expect that Democrats will "gain more [seats] in the State House in 2020." [Doc. 17, ¶ 38].

As the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are already doing. They cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) (internal quotations and citations omitted). Organizations must show that the challenged law's effect "goes far beyond 'business as usual'" through "concrete evidence showing that [the law] is already disrupting their operations and … will likely require them to significantly change or expand their activities." *Id.*

Unlike Plaintiffs in this case, political organizations that have successfully demonstrated standing under a diversion-of-resources theory have done so by providing courts with specific examples as to how they have made a shift in their operations to address a challenged law. *See, e.g.*

*Common Cause / Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). In contrast, courts regularly dismiss cases where organizations have failed to point to some meaningful change from their usual operations that they have had to make because of the challenged law. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-460 (6th Cir. 2014) (organization's election volunteers were already being trained about voting procedures); *Ind. Democratic Party v. Rokita*, 458 F.Supp.2d 775, 816-17 (S.D.Ind. 2006) (plaintiffs "vaguely assert[ed]" that they would "divert unspecified resources to various outreach efforts.")

The Organizational Plaintiffs have not alleged any activities they plan to change or any operations that will be disrupted by the Ballot-Order Statute. Rather, they merely perceive the Ballot-Order Statute as "simply a setback to [their] abstract social interests" of winning elections. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). Their Complaint does not set forth a legally cognizable basis for standing and, as such, their claims should be dismissed.

2. <u>Plaintiffs DNC and DPG cannot base claims for</u>
<u>associational standing on harms to voter members.</u>

DNC and DPG also assert associational standing, alleging that their

"*voter members* and [their] constituency of Democratic *voters*" have been

injured by the Ballot-Order Statute. [Doc. 17, ¶¶ 19, 22] (emphasis added). In

order to bring suit on behalf of their members, DNC and DPG would have to

establish that "its members would otherwise have standing to sue in their

own right, the interests at stake are germane to the organization's purpose,

and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Sierra Club v. United*

*States EPA*, 793 F.3d 656, 661 (6th Cir. 2015) (quoting *Friends of the Earth,*

*Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000)). They must "make specific

allegations establishing that at least one identified member" has suffered or

will suffer harm. *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th

Cir. 2018).

DNC and DPG have identified only one individual, S.P.S, that

"considers himself to be a member of the Democratic Party"[5] [Doc. 17, ¶ 15],

but as indicated above, neither S.P.S. nor any other individual voter that

---

[5] The other individual Plaintiffs do not allege that they are members of any
organization. [Doc. 17, ¶¶ 16-18].

they might claim as members would have standing under the holding in

*Mann* because they are not candidates. Because associational standing

requires that the organization's members "would otherwise have standing to

sue in their own right," DNC and DPG also cannot establish standing based

on any alleged harm to their voter members.[6]

## II.   Plaintiffs' Complaint raises a solely nonjusticiable political question beyond the jurisdiction of this Court.

### A.   *Political questions are outside of Article III jurisdiction.*

"A federal court has no authority to review a political question."

*McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1357 (11th Cir. 2007).

The political question doctrine "protects the separation of powers and

prevents federal courts from overstepping their constitutionally defined role."

*Id.*, *citing Baker v. Carr,* 369 U.S. 186, 210 (1962). If a case requires the court

to decide a political question, it must be dismissed for lack of jurisdiction.

*Made in the USA Found. v. U.S.*, 242 F.3d 1300, 1319 (11th Cir. 2001).

---

[6] *Mann* does suggest that under appropriate circumstances political candidates or even parties might have sufficient standing to challenge a ballot-order statute, but this conclusion does not apply where, as here, DNC and DPG have expressly pleaded that the members they purport to represent are their "*voter* members and [their] constituency of Democratic *voters*." [Doc. 17, ¶¶ 19, 22] (emphasis added).

The Supreme Court identified six elements that are likely to be

"prominent on the surface of any case held to involve a political question":

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 216 (1962). "Significantly, any one of the above-

listed characteristics may be sufficient to preclude judicial review." *Made in*

*the USA Found.*, 242 F.3d at 1312.[7]

> **B.** *The Constitution requires most decisions about elections to be made by States.*

With regard to the first *Baker* factor—a "textually demonstrable

constitutional commitment of the issue to a coordinate political

department"—the Elections Clause of the United States Constitution (Art. I,

§4, cl. 1) clearly commits the "Times, Places and Manner of holding Elections"

to state legislatures, while giving Congress the power to "make or alter" any

---

[7] While the existence of any one of the *Baker* factors can indicate that a case presents a nonjusticiable political question, courts have generally held that the first two *Baker* factors are generally the most important. *See Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) (collecting cases).

such regulations. The Elections Clause's delegation of power to state

legislatures and Congress is expansive:

> It cannot be doubted that these comprehensive words embrace
> authority to provide a complete code for congressional elections, not
> only as to times and places, but in relation to notices, registration,
> supervision of voting, protection of voters, prevention of fraud and
> corrupt practices, counting of votes, duties of inspectors and
> canvassers, and making and publication of election returns; in short, to
> enact the numerous requirements as to procedure and safeguards
> which experience shows are necessary in order to enforce the
> fundamental right involved.

*Smiley v. Holm,* 285 U.S. 355, 366 (1932).

The Constitution specifically reserves authority regarding the integrity

and efficiency of elections to the states. *Storer v. Brown*, 415 U.S. 724, 730

(1974); *see also Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006).

"[T]he framers of the Constitution intended the States to keep for themselves,

as provided by the Tenth Amendment, the power to regulate elections."

*Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v.*

*Dougall*, 413 U.S. 634, 647 (1973)); *Burdick v. Takushi*, 504 U.S. 428, 433

(1992) (voters do not have an absolute right to vote in any way they choose).

   C.   *Plaintiffs ask this Court to involve itself in the reallocation of*
        *political power—a task for which there are no judicially*
        *manageable standards.*

While federal courts can intervene when there are systemic problems in

state election systems, "[f]ederal judges have no license to reallocate political

12

power between the two major political parties with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2507, 204 L.Ed.2d 931 (2019). *Rucho* addressed the question of partisan gerrymandering, but its reasoning is equally applicable here, where Plaintiffs are asking the Court to reallocate political power between the two parties, not by shifting voters from one district to another, but by shifting ballot positions so that Democrats may receive what they claim is their "fair share" of "windfall voters."[8]

Like the plaintiffs in *Rucho*, Plaintiffs would like the "windfall vote" to be allocated fairly between the political parties as well. But the *Rucho* court flatly rejected the fundamental premise that the Constitution allows this kind of re-allocation, saying "[o]ur cases . . . clearly foreclose any claim that the Constitution requires proportional representation . . . [F]ederal courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so." *Id*. at 2499.

---

[8] In *Jacobson v. Lee*, 2019 U.S. Dist. LEXIS 198380, 2019 WL 6044035 (N.D. Fla. Nov. 15, 2019), the Florida court did not apply *Rucho* to Plaintiffs' challenge to Florida's Ballot Order Statute. But nowhere in the *Rucho* decision does the Supreme Court limit its reasoning to one type of political question. Rather, the general conclusion that "federal courts are ill-equipped to apportion political power" applies equally in cases where the fundamental issue before the court involves a question of fairness between political parties—exactly what Plaintiffs articulate in this case.

*Rucho's* reasoning that there were no judicially manageable standards for reallocating political power to try to achieve "fairness" in partisan representation applies precisely here. The Court explained:

> Deciding among just these different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral.

*Id.* The same is true in ballot-order cases. There are approximately 20 different ballot ordering methods being used by the states today.[9] For this Court to decide what is most "fair" between the political parties (and/or independent candidates), it must engage in the business of reallocating political power—a task which is clearly beyond the scope of federal-court jurisdiction.

## III.   Plaintiffs' Complaint should be dismissed for failure to state a claim upon which relief can be granted.

In addition to asking this Court to decide a nonjusticiable political question, Plaintiffs' Complaint does not sufficiently allege a violation of any of Plaintiffs' constitutional rights.

---

[9] For a compilation of the various procedures used for ordering candidate names in general election, see Table 1 to the Expert Report of Dr. Jon A. Krosnick, filed in *Jacobson*, 4:18-cv-00262-MW-CAS, Doc. 31, pp. 63-64 (N.D. Fla. June 29, 2018).

A.    *Plaintiffs' Complaint does not state a claim for vote dilution.*

Plaintiffs' attempt to characterize the harm to Democratic voters as "vote dilution" is misplaced, particularly after the Supreme Court's holding in *Rucho*. Typical vote-dilution cases are those in which malapportionment among districts results in votes from large districts counting for less than votes cast in small districts because it "takes a larger number of votes in the former district to have the same electoral impact as a smaller number of voters in the latter district." *Sarvis v. Judd*, 80 F. Supp. 3d 692, 700 (E.D. Va. 2015). This violates the constitutional principle of "one person, one vote" because each individual's vote is not accorded the same weight. *Id.*; *Reynolds v. Sims*, 377 U.S. 533, 567 (1964). But as *Rucho* has now made crystal clear, a voter is entitled to a vote of equal weight—but is *not* entitled to have that weight distributed to the *political party* of his or her choosing:

> "vote dilution" in the one-person, one-vote cases refers to the idea that each vote must carry equal weight. In other words, each representative must be accountable to (approximately) the same number of constituents. That requirement does not extend to political parties. It does not mean that each party must be influential in proportion to its number of supporters.

139 S.Ct. at 2501.[10]

---

[10] The Supreme Court also explained that racial gerrymandering claims are distinct from claims seeking the elimination of partisanship, saying "a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead

Even before *Rucho*, courts addressing ballot order claims understood that an allocation of the "windfall vote" does not cause vote dilution. As the Supreme Court of Minnesota explained:

> Positional bias . . . *does not create any "phantom" votes or reduce the value of any individual vote, because the "biased" votes themselves are cast by fully qualified voters*. We know of no authority which would allow us to treat the votes of any voters, however ill-informed, as if they were somehow inferior, thereby "diluting" the effect of the more thoughtfully cast ballots. In short, *the fact that some citizens may choose to vote irrationally*, as is their right, does not mean that the votes of better-informed voters are arithmetically "diluted" within the language of the reapportionment decisions.

*Ulland v. Growe*, 262 N.W.2d 412, 416 (Minn. 1978) (emphasis added).

Similarly, the Southern District of New York took this approach:

> [R]eapportionment cases have already been held to be inapposite to position bias. The victims of reapportionment are the voters of the larger district, whose votes actually count for less representation than votes cast in the smaller district. No such dilution of the value of one's vote exists in the context of position bias because an irrational vote is just as much of a vote as a rational one.

*New Alliance Party v. New York Bd. of Elections*, 861 F. Supp. 282, 296-297 (S.D. N.Y. 1994).

Count I of Plaintiffs' Complaint is based entirely on the claim that the Ballot-Order Statute's allocation of the "windfall vote" causes *individual* vote

---

for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship." *Rucho*, 139 S.Ct. at 2502.

dilution. But even assuming Plaintiffs' claim that the Ballot-Order Statute makes elections harder for *Democrats* to win, it does not dilute the value of any *individual* voter's vote. Because Count I of Plaintiffs' Complaint rests entirely on a vote dilution theory, it must therefore be dismissed.

B.   *Plaintiffs' Complaint fails to state a claim for any violation of the Equal Protection Clause.*

In *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1993), the Supreme Court laid out the balancing test for evaluating fundamental-right-to-vote claims involving state election laws, now known as the *Anderson/Burdick* test. A court first considers the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule . . . Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id.* at 789-90. A "severe" burden on constitutional rights is subject to strict scrutiny. *Burdick v. Takushi,* 504 U.S. 428, 434 (1992). "But when a state election law imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important

regulatory interests are generally sufficient to justify the restrictions."
*Id.* (internal quotations omitted).

Courts have repeatedly found that state's ballot-order statutes and the resulting distribution of the "windfall vote" pose only minimal burdens, if any, upon the right to vote and, as a result, do not require strict or heightened scrutiny under the *Anderson/Burdick* framework. *See Meyer v. Texas*, 2011 U.S. Dist. LEXIS 50325 at *17-18, 2011 WL 1806524 (S.D. Tex. May 11, 2011) ( "character and magnitude" of any constitutional violation was slight when voter only had to "look a bit further down the ballot" to vote for the candidate); *Shaefer v. Lamone,* 2006 U.S. Dist. LEXIS 96855, 2006 WL 8456798 (D. Md. Nov. 30, 2006) (no burden on voters by having to find their candidates' name on the list; only possible harm from lower ballot position was that some percentage of voters would vote for someone else, which does not cause a constitutional harm); *Clough v. Guzzi,* 416 F. Supp. 1057, 1067 (D. Mass. 1976) (no constitutional harm to non-incumbent candidate from ballot position allocating "windfall vote" to incumbents; state need only show some legitimate, rational reason to justify ballot order statute); *New Alliance Party*, 861 F. Supp. at 295 (no injury to constitutional rights of political party from lack of ability to capture "windfall vote," nor do voters have a constitutional right to a "wholly rational election"); *Sarvis,* 80

F. Supp. 3d at 692 (any burden on voters' rights is not severe and state is entitled to deferential constitutional analysis of justification for ballot order law). This Court should find that Georgia's Ballot-Order Statute imposes almost no burden and it should not be subjected to strict or heightened scrutiny. This Court need only determine whether there is a legitimate, rational reason for the Ballot-Order Statute's ordering rules.

Georgia has an interest in creating an orderly ballot, avoiding voter confusion, and maintaining party-order ballot symmetry.[11] Streamlining a voter's ability to engage in "straight party voting" is an "important interest" because it speeds up the election process and helps avoid long lines:

> The ballot law ensures that if a party's candidate for United States Senator is listed second, for example, then candidates from that party will be second in lists for other offices as well. This again advances the state's interest in "efficient procedures for the election of public officials." [Cit.] It makes the ballot more easily decipherable, especially for voters looking for candidates affiliated with a given party.

*Sarvis v. Alcorn*, 826 F.3d 708, 720 (4th Cir. 2016). Party-order symmetry improves the speed and ease with which voters cast their ballots, facilitating

---

[11] The *Jacobson* court found that interests in orderly ballots and preventing voter confusion were interests that justified only the existence of a ballot order procedure in general, not the particular ballot order used in Florida. But there appears to have been no consideration of whether creating party-order symmetry was an interest justifying Florida's particular ballot ordering system, and it is this interest that is best served by the ballot-order method used in Florida and Georgia.

the state's important interest in improving the accuracy and efficiency of the voting process. *Sarvis,* 80 F. Supp. 3d at 706-07. This justification for ballot ordering along party lines is "not just plausible. It is eminently reasonable and logical. The commonwealth has identified, and properly advanced, a state interest that is at least important, if not compelling." *Id.*

Further, the remedy sought by Plaintiffs (ballot rotation), creates its own possibility of harm and works against the state's interest in orderly and efficient elections:

> Rotation of ballots avoids the danger of choosing a public officer primarily by lottery. It gives each candidate an equal share of the "donkey vote." But it creates extra work and some extra expense, and may create some risk of error and delay in counting paper ballots. The reported cases suggest that it creates special problems where voting machines are used.

*Tsongas v. Secretary of Commonwealth*, 362 Mass. 708, 719-720 (1972). Georgia's Ballot-Order Statute facilitates straight-party voting, avoids confusion, and makes voting easier and more efficient. The Ballot-Order Statute does not violate the Equal Protection Clause, and Count II of Plaintiffs' Complaint must also be dismissed.

**IV.  Plaintiffs' Complaint is barred by laches because they strategically delayed in filing this case, causing harm to Defendants in the interim.**

A party is barred by laches from receiving equitable relief when that party has unreasonably delayed in seeking that relief and the delay is prejudicial to the entity from whom the relief is sought. *NUCO Invs., Inc. v. Hartford Fire Ins. Co.*, 2005 U.S. Dist. LEXIS 47054 at *20-21 (N.D.Ga. June 17, 2005). A lack of diligence is shown when the plaintiff "delayed inexcusably or unreasonably in filing suit." *Perry v. Judd*, 840 F. Supp. 2d 945, 950 (E.D. Va.), *aff'd,* 471 F. App'x 219 (4th Cir. 2012). "Delay and prejudice are a complementary ratio: the more delay demonstrated, the less prejudice may be shown." *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1991)).

A.    *Plaintiffs unreasonably delayed in filing this action.*

In the context of elections, "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) *citing Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968). As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. *Id.*

Georgia's Ballot-Order Statute was passed fifty-five years ago, in 1964. Code 1933, Section 34-1103, enacted by Ga. L. 1964, Ex. Sess., p. 26, Section 1. Under the allegations of Plaintiffs' Complaint in this case, the law favored Democrats over Republicans until 2002, when Sonny Perdue was elected Governor of Georgia. The first general election in which the ballot order statute provided for Republicans to be listed first on the general election ballot took place fifteen years ago, in 2004.

Over decades, numerous cases have challenged ballot order statutes and made claims regarding the "windfall vote," with mixed results. Plaintiffs' Complaint cites the cases they deem helpful to their position, most of which were decided in the 1970s. [Doc. 17, ¶¶ 7-8]. Given how long the Ballot-Order Statute has been in place and how many lawsuits have been brought making claims about the order of candidates over the intervening decades, it is clear that Plaintiffs could have brought this suit much earlier.

More importantly, the Organizational Plaintiffs (with the exception of DPG) filed an action challenging Florida's nearly identical ballot order statute almost two years ago—in May 2018. *Jacobson v. Lee*, United States District Court for the Northern District of Florida, Civil Action File No. 4:18-

cv-00262-MW-CAS. Only after a full trial on the merits in Florida did Plaintiffs file suit in Georgia, Arizona, and Texas on the same day.[12]

Presumably for strategic reasons, Plaintiffs chose to try this issue in Florida as a "test case" first before filing in additional states. But Plaintiffs cannot delay their case for strategic reasons and expect for that delay to result in no consequences. In *Marshall*, 921 F. Supp. at 1494, the Court dismissed an action on laches grounds where plaintiffs delayed filing suit for a year in an attempt to pursue non-judicial resolutions:

> Plaintiffs' argument, however, would permit them to use their own strategic delay to avoid laches. 'Strategic' is not used here in the pejorative sense; rather the plaintiffs concede that their strategy was to avoid the costs and political consequences of litigation by attacking the open primary law outside the courts.

921 F. Supp. at 1494. *See also Perry*, 471 Fed. App'x. at 219 (election law had been in place for over a decade and had governed multiple presidential primaries). Plaintiffs' strategic delay weighs in favor of dismissing the action if their actions also caused prejudice to Defendants.

---

[12] *Miller v. Texas Secretary of State*, United States District Court for the Western District of Texas, Civil Action File No 1:19cv1071 (filed Nov. 1, 2019); *Mecinas v. Hobbs*, United States District Court for the District of Arizona, Civil Action File No 2:19cv5547 (filed Nov. 1, 2019).

B.    *Plaintiffs' delay in bringing this action prejudiced Defendants.*

While Plaintiffs were litigating in Florida, the State of Georgia was making significant changes to its election laws and investing millions of dollars in new voting machines, all while working under tight time constraints to implement new voting equipment and train local election officials in its use and operation.

Plaintiffs filed *Jacobson* in May 2018. Georgia's legislature passed laws requiring new statewide voting systems in April 2019—almost a year later. 2019 Ga. H.B. 316 (enacted April 2, 2019). The state subsequently purchased a system at a significant cost to Georgia taxpayers. See *Curling v. Raffensperger*, 2019 U.S. Dist. LEXIS 139377 at *14 (N.D. Ga. Aug. 15, 2019). As this Court knows well, the State has already been working to implement this new voting system "on a very aggressive schedule." *Id.* at *153.

Plaintiffs' requested relief in this case would come at a high price, because Georgia would have to add yet another step to an already-aggressive transition. Courts have found laches to bar challenges to election laws where, as here, the challenge comes after a state has already invested resources to prepare for an upcoming election. *See Dobson v. Dunlap* 576 F. Supp.2d 181, 187 (D. Me. 2008); *Perry*, 471 Fed. App'x at 227; *Fulani*, 917 F.2d at 1031; *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980).

Courts are particularly receptive to laches defenses where granting the relief could inject disorder into the election-preparation process. In *Marshall*, the Court indicated that striking an elections statute would throw the parties "into a frenzy of activity" that could have been avoided had the plaintiffs not "slept on their rights to the detriment of the intervenor." 921 F. Supp. at 1494. And as the *Perry* court explained:

> Ballots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed.

421 Fed. App'x at 226-228. *See also Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) (denying preliminary injunction where granting relief would "throw the state's preparations for the election into turmoil"). Because Plaintiffs' choice to delay filing this case places Georgia at a greater risk of turmoil and disruption than an earlier filing would have caused, this Court should dismiss Plaintiffs' claims.

## <u>CONCLUSION</u>

This case is not appropriate for resolution by this Court because it lacks Article III jurisdiction. Plaintiffs lack standing and their Complaint is barred as a political question, by Plaintiffs' delays, and because Plaintiffs failed to state a claim. The Court should dismiss Plaintiffs' Complaint.

Respectfully submitted this 10th day of January, 2020.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Annette M. Cowart
Deputy Attorney General
Georgia Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
Office of the Georgia Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
