IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| S.P.S., *ex rel.* SHORT, *et al.*<br><br>    *Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>    *Defendants.* | CIVIL ACTION<br><br>FILE NO. 1:19-CV-04960-AT |

**DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION TO DISMISS**

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

**I.   Plaintiffs lack standing to pursue their claims.**

In order to establish standing to sue, a plaintiff must satisfy three criteria: (1) demonstrating injury in fact, (2) showing a causal connection between the injury and the challenged action that is fairly traceable to the defendant's conduct; and (3) establishing that it is likely that a favorable judgment will redress her injury. *Lewis v. Governor of Alabama*, 944 F. 3d 1287, 1296 (11th Cir. 2019). As an initial matter, Plaintiffs have not alleged that O.C.G.A. § 21-2-285(c) (the "Ballot-Order Statute") impairs the right of voters to select a candidate of their choice or otherwise encumbers their vote in any way. Nor does the weight given to a vote for a Democratic candidate

1

change depending upon whether other votes cast for Republican candidates are made intelligently or thoughtlessly. Plaintiffs' response failed to show that each subgrouping of plaintiffs—whether organizational, associational, or individual—established Article III standing.

    A.    *The Ballot-Order Statute does not cause "vote dilution."*

To the extent that Plaintiffs continue to rely on "vote dilution" as a basis for standing,[1] their claims must be dismissed. To set forth a claim for vote dilution, a plaintiff must demonstrate that his or her vote is somehow given less weight than a vote cast by a resident of another district. *Gill v. Whitford*, 138 S.Ct. 1916, 1930-31 (2018). A vote-dilution claim must be founded upon individual legal rights (not group rights) because allegations of statewide harm are not sufficient. *Id.* at 1933. Plaintiffs' citation of pre-*Gill* cases is unavailing.

In this case there are no "districts" or other groups of voters whose votes are given more weight than those cast by Plaintiffs. There are simply votes cast for Democratic candidates and votes cast for non-Democratic candidates, all of which are counted and correctly weighted under "one person, one vote" standards. Plaintiffs apparently filed this case precisely

---

[1] Plaintiffs generally refer to this concept as "devaluing" a vote. *See* [Doc. 41, pp. 17-18].

*because* each person's vote enjoys the same electoral weight—regardless of whether such person engaged in any thought before casting his or her vote.

A vote for a Democratic candidate does not somehow "weigh" less simply because another voter chooses to vote for a Republican candidate. But under Plaintiffs' theory of vote dilution, a deliberate and intentional vote for a Republican candidate is constitutionally permissible, while a vote thoughtlessly cast for that same Republican candidate on the basis of ballot position renders it unconstitutional. There is no basis to support the notion that whether one's vote is diluted turns entirely upon the subjective and hidden deliberative processes of the people voting for a political opponent. This Court should exercise caution before attempting to draw constitutional lines around the private motives of voters.

While S.P.S. and the organizational Plaintiffs alleged other standing theories in addition to vote dilution, the Individual Plaintiffs' only allegation of standing is that the Ballot-Order Statute causes their vote to be diluted. [Doc. 17, ¶¶ 16–18]. Accordingly, this Court should dismiss any claims based on vote dilution for lack of standing.

    B.    *The Individual Plaintiffs lack standing and must be dismissed.*

The Ballot-Order Statute does not interfere in any way with Plaintiffs' ability to vote for candidates of their choice. Assuming that the Ballot-Order

Statute is ultimately shown to confer the advantage that Plaintiffs claim, the only resulting injury is that Plaintiffs' preferred candidates might have a small statistical disadvantage relative to their Republican opponents.

This harm, to the extent it exists, does not cause injury to any voter. The *Mann v. Powell* court correctly recognized that even if ballot order favors one candidate over another, individual voters do not have a sufficient "personal stake in the outcome" of the case to serve as a basis for standing. 333 F.Supp. 1261, 1264-65 (N.D.Ill. 1969), *aff'd* 398 U.S. 955 (1970). Plaintiffs' transparent attempt to have *Mann* support their position in some areas but not others is not availing. [Doc. 41, p. 18 n.1].

Other courts have also recognized that *voters* lack standing to raise claims that are derivative of harm experienced by *candidates*. Courts have distinguished cases in which *voters* are injured—such as in cases where a voter cannot vote for the candidate of their choice—from those in which a candidate merely gains some advantage relative to another candidate. *Gottlieb v. FEC*, 143 F. 3d 618, 622 (D.C. Cir. 1998) (affirming dismissal and holding that individual voters lacked standing to assert claim that campaign-finance rules put their preferred candidate at a disadvantage). A candidate's advantage or disadvantage does not prevent voters from raising funds, volunteering, or voting for the candidate of their choice. *Id.*

4

Similarly, the First Circuit Court of Appeals concluded that voters' injuries cannot be derivative of a candidate's harm. *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) ("Such 'harm,' however, is hardly a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing"). *See also Hollander v. McCain*, 566 F.Supp.2d 63, 68-69 (D. N.H. 2008) (inclusion of ineligible rival on ballot did not injure voter by siphoning votes from preferred candidate; voter lacked standing to challenge a "competitive disadvantage" between political rivals).

The same is true with regard to challenges to the Ballot-Order Statute. If the Ballot-Order Statute creates a "competitive disadvantage" to Democratic candidates, the voters themselves have not sustained an injury. They cannot support their own claims with a derivative harm to an absent candidate. The individual Plaintiffs must therefore be dismissed.

C.   *The Party Plaintiffs' claims should be dismissed.*

Claims made by Plaintiffs DNC Services Corp. ("DNC"), DSCC, DCCC, and the Democratic Party of Georgia, Inc. ("DPG") (together referred to as the "Party Plaintiffs")[2] must also be dismissed to the extent that they rely on

---

[2] In their First Amended Complaint, Plaintiffs referred to these entities, along with Plaintiff Priorities USA, as the "Organizational Plaintiffs." [Doc. 17]. In their Response to Defendants' Motion to Dismiss [Doc. 41], Plaintiffs removed Plaintiff Priorities USA from the group and refer to the remaining

5

associational-standing theories. As an initial matter, it is unclear whether Plaintiffs actually alleged harm to their associational interests in the First Amended Complaint. Even a charitable reading of the First Amended Complaint seems to cabin Plaintiffs' claims specifically to alleged harm to their "voter members" and "constituency of Democratic voters":

> This litigation is brought by a group of Plaintiffs, who have supported and intend to continue to support Democratic candidates in Georgia, and all of whom have suffered and, absent an order from this Court, are guaranteed to continue to suffer injury as a result of the Ballot Order Statute.

[Doc. 17, ¶ 5]. But even if this Court finds that the Party Plaintiffs have sufficiently alleged associational standing such that they can "stand in the shoes" of candidate members ostensibly injured by the Ballot-Order Statute, they cannot establish the second prong of Article III standing: That the injury complained of is fairly traceable to Defendants. Plaintiffs completely ignore this component of standing in their Response.

In order for a political party to establish associational standing, Plaintiffs must not only "show that at least one member faces an imminent threat of injury," *Democratic Party of Ga., Inc. v Crittenden,* 347 F. Supp. 3d

---

Organizational Plaintiffs as "Party Plaintiffs" in order to assert associational standing on their behalf. Defendants adopt the nomenclature used by Plaintiffs in their Response.

1324, 1337 (N.D. Ga. 2018), but also that this injury "must have been caused by the *defendant's* complained-of actions." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992)) (emphasis added).

The injury about which Plaintiffs complain is caused not by Defendants' actions, but by the very voters Plaintiffs claim to be protecting. Indeed, the primacy effect, to the extent it exists at all, is a product of the volition of each voter. Plaintiffs are concerned in this case that voters may express such volition cavalierly or even haphazardly. But such motivations dwell within each individual, and they are neither constitutionally impermissible nor even improper. Accordingly, the harm the Plaintiffs allege here is traceable only to the *voters* and not Defendants.

Unlike other cases of vote dilution, Plaintiffs do not allege the government is impeding someone's capacity or ability to vote. Plaintiffs do not allege a violation of "one person, one vote" or that Defendants are administering elections improperly. Instead they complain about the government's ordering of a ballot so that each voter may cast a vote according to the dictates of their own conscience. But the decision of a voter to select a candidate occupying a particular ballot position lies with that voter, and that voter alone. Because of this, any injury Plaintiffs allege results *entirely* from

that decision, and not from any action or inaction of the Defendants and is not fairly traceable to the Defendants. *Lewis*, 944 F.3d at 1298.

    D.    *The Organizational Plaintiffs have not alleged a direct injury to their organizations.*

Both the Party Plaintiffs and Organizational Plaintiffs—to the extent they are distinct from the Party Plaintiffs—also fail to establish organizational standing because the only harm they have alleged is that their "ultimate goal has been made more difficult," an allegation that is legally insufficient to form a basis for standing. *New Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F.Supp.3d 142, 166 (D.D.C. 2016). An organization seeking to establish direct standing must allege more than a frustration of its purpose because frustration of an organization's objectives "is the type of abstract concern that does not impart standing." *Nat'l Taxpayer's Union, Inc. v. United* States, 68 F.3d 1428, 1433 (D.C. Cir. 1995); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015). The Court's task is to differentiate between having an activity impeded or a mission compromised. *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 37 (D.D.C. 2018).

In support of their claim of organizational standing, Plaintiffs cite to a litany of cases outside of the Eleventh Circuit. [Doc. 41, pp. 3–4]. To be sure,

8

the Plaintiffs do not cite to a single case either in this district or from the Eleventh Circuit that found that a mere diminishing of electoral prospects is sufficient to confer standing upon an organization. At least one court in this district has found that a true diversion of resources must accompany the alleged injury. *Crittenden,* 347 F. Supp. 3d at 1336. None of the Organizational Plaintiffs or Party Plaintiffs have done that here.

"Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Id*. The Organizational Plaintiffs claim they have "diverted" resources because the Ballot-Order Statute frustrates its "core function" and that they "ha[ve] had to and will have to expend and divert funds … in order to combat the effects' of the Statute." [Doc. 41, pp. 5–6; see also, Doc. 17, ¶¶ 20–23]. But the Organizational Plaintiffs' conclusory allegations that they are "diverting resources" falls flat when one considers that their "core function" is the election of Democrats, and they only allege that the Ballot-Order Statute makes that more difficult. Put differently, even if this Court takes Plaintiffs' First Amended Complaint as true, the Party Plaintiffs are not diverting resources to some ancillary mission. To the contrary, they are simply *concentrating* resources on what is their self-described existential purpose.

9

This was not the case in *Crittenden*, where the plaintiffs provided the Court with declarations clearly demonstrating, among other things, "how the inadequate cure period and procedures for handling provisional ballots has forced them to *shift resources away* from preparing for the upcoming runoff election to providing assistance to members adversely impacted by the curative procedures." *Crittenden,* 347 F. Supp. 3d at 1337 (emphasis added).

The Ballot-Order Statute does not place any such special or extra-organizational burden on the Organizational Plaintiffs. Regardless of whether they fail or succeed in this litigation, the Organizational Plaintiffs will continue doing the *exact same things* in order to elect Democrats. The order of candidates on the ballot results in no such shift in resources. In 2020, the Party Plaintiffs will presumably instruct their members and constituents to vote Democratic—regardless of who is first on the ballot.

Other than making the generic claim that the Ballot-Order Statute makes elections marginally more difficult for Democratic candidates to win, Plaintiffs cannot point to any of their activities that have been impeded. Further, unlike in *Crittenden*, Plaintiffs here cannot explain how the Ballot-Order Statute requires them to expend resources to combat its effects. *Nat'l Veterans Legal Servs. Program v. United States DOD*, 2016 U.S. Dist. LEXIS 110492, *21 (D.D.C. 2016) (expending additional funds on current programs

was not an injury to plaintiffs' interest). Plaintiffs have offered nothing other than vague claims that they will somehow "divert resources" to "combat the effects of the Ballot Order Statute" [Doc. 17, ¶¶ 19-23]. There are no allegations about what resources will be diverted, other than that they will pursue the same strategies they would otherwise employ in a key battleground state. Organizational Plaintiffs' claims must be dismissed.

## II. Plaintiffs' Amended Complaint presents only nonjusticiable political questions.

Plaintiffs contend that this case is justiciable, arguing that the Supreme Court's holding in *Williams v. Rhodes*, 393 U.S. 23 (1968) "rejected an argument markedly similar to the one Defendants raise here." [Doc. 41, p. 11]. *Williams* involved restrictive Ohio ballot access laws that made it "virtually impossible" for a new party to be placed on the state ballot. 393 U.S. at 28. But that case, which placed "heavy burdens on the right to vote and to associate" by barring candidates from appearing on a ballot at all, *id.* at 31, presents very different circumstances from this one, in which no candidate is barred from appearing on the ballot and no voter is denied the ability to vote for the candidate of his or her choice.

Nor does the Ninth Circuit Court of Appeals' recent decision in *Democratic National Committee v. Hobbs,* No. 18-15845 (9th Cir. Jan. 27,

11

2020) shed any light on the justiciability of this case. *Hobbs* found that two Arizona statutes placed a discriminatory burden on the rights of minority voters. The Court found that racial discrimination was a motivating factor in enacting the statutes, and, contrary to Plaintiffs' assertions, made no finding that cases that "involve[] a question of fairness between political parties" are justiciable. [Doc. 42, p.2]. *Hobbs* turns entirely on race, delving into the "history of official discrimination" in Arizona and the motivations underpinning the passage of the statutes at issue. Laws that discriminate on the basis of race, as the Supreme Court's acknowledged in *Rucho v. Common Cause,* 139 S.Ct. 2484, 2496 (2019), are presumptively invalid.

In sharp contrast, *Rucho* cautions that "[f]ederal judges have no license to reallocate *political* power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." 139 S.Ct. at 2507 (emphasis added). Plaintiffs cannot avoid that this is exactly what they are asking this Court to do.

The only court to have considered whether *Rucho's* rationale applies to a challenge to a ballot-order statute is the United States District Court for the Northern District of Florida in *Jacobson v. Lee*, 2019 U.S. Dist. LEXIS 198380, 2019 WL 6044035 (N.D. Fla. Nov. 15, 2019). That court failed to

engage in any substantive analysis of the justiciability issue, deciding that it would simply not apply *Rucho* outside the gerrymandering context and moving on. But even if this Court does not believe that *Rucho* controls this case, the general standards for determining whether a case presents a nonjusticiable political question were defined long before *Rucho* and continue to apply. *See Baker v. Carr*, 369 U.S. 186 (1962). This Court should not rely on an opinion that failed to conduct any analysis whatsoever of whether the *Baker* factors do or do not apply to this case.

*Baker* identified numerous factors, one of which would be "prominent on the surface of any case held to involve a political question." 369 U.S. at 217. At least two of these factors—a "textually demonstrable constitutional commitment of the issue to a coordinate political department" and a "lack of judicially discoverable and manageable standards for resolving [the issue]"—are present here. *Id.* The manner of holding elections has been textually committed to Congress and state legislatures through in the Elections Clause, U.S. Const. Art. I, § 4, Cl. 1, and the wide variety of ways that states determine ballot order show that there are not judicially discoverable and manageable standards for a court, rather than a legislative body, to decide what ballot-ordering system works best.

The nonjusticiability of a political question is "primarily a function of the separation of powers." 369 U.S. at 210. The Ballot-Order Statute, which does not foreclose any Democratic candidate from appearing on the ballot or prevent any Democratic voter from voting for their chosen candidate, is a non-discriminatory regulation of the manner of conducting elections, and Georgia's legislature's decision as to how to arrange its ballots should not be usurped by court intervention.

### III. Plaintiffs have failed to state a claim upon which relief can be granted.

Even if the Ballot-Order Statute resulted in some Democratic candidates having a slightly reduced chance of ultimately willing their elections, "[s]uch 'harm,' however, is hardly a restriction on voters' rights." *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000).

Plaintiffs also claim that their right to equal protection is violated because the Ballot Order "treat[s] similarly situated political parties differently." [Doc. 41, p. 16]. But the Constitution guarantees equal protection to persons, not equal representation to political parties. *Vieth v. Jubelirer*, 541 U.S. 267, 288 (2004). Plaintiffs have not shown that their right to vote has been burdened at all. "All that plaintiff really alleges is that its opportunity to capture the windfall vote has been impeded. While access to

the ballot may, at times, be afforded constitutional protection, access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *New Alliance Party v. New York Bd. Of Elections*, 861 F.Supp. 282 (S.D.N.Y. 1994). Plaintiffs have not demonstrated that they have sustained a constitutional injury at all, and have not shown that there is any burden upon the right to vote that would require even minimal scrutiny of the state's interests.

Even if the Court were to find that the Ballot-Order Statute poses some sort of burden upon Plaintiffs' right to vote, then the Court simply considers the state interest justifying that burden. *Burdick v. Takushi*, 504 U.S. 428, 439 (1992). Defendants put forward a number of compelling reasons justifying the state's interest in maintaining the Ballot-Order Statute. Plaintiffs' response does not even attempt to address those justifications. Given the lack of any allegation that the state's interests are insufficient to outweigh any alleged burden, Plaintiffs' claims should be dismissed.

## **CONCLUSION**

Plaintiffs lack standing and seek to have this Court allocate political power in Georgia. This Court should dismiss Plaintiffs' First Amended Complaint.

Respectfully submitted this 7th day of February, 2020.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Annette M. Cowart
Deputy Attorney General
Georgia Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson