# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

S.P.S., *ex rel.* SHORT, *et al.*,

      Plaintiffs,

v.

BRAD RAFFENSPERGER, *et al.*,

      Defendants.

CIVIL ACTION NO.
1:19-CV-04960-AT

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

    I.    The standard of proof to establish standing at trial is different than the standard of proof at the pleading and preliminary injunction stages. .........3

    II.    Plaintiffs have established injury in fact. ....................................................5

    III.    Plaintiffs' injuries are traceable to and redressable by the Secretary and the State Election Board. ..........................................................................14

CONCLUSION ....................................................................................................21

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Bay County Democratic Party v. Land*,
  347 F. Supp. 2d 404 (E.D. Mich. 2004) ............................................................10

*Bischoff v. Osceola Cty.*,
  222 F.3d 874 (11th Cir. 2000) ...............................................................................3

*Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*,
  448 F.3d 138 (2d Cir. 2006) ..................................................................................7

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ...........................................................................19

*Church v. City of Huntsville*,
  30 F.3d 1332 (11th Cir. 1994) ...............................................................................4

*City & Cty. of San Francisco v. U.S. Dep't of Homeland Sec.*,
  944 F.3d 773 (9th Cir. 2019) .................................................................................4

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media et. al.*,
  No. 18-1171, 140 S. Ct. 1009 (2020) ....................................................................3

*Common Cause Ga. v. Kemp*,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018) ...............................................................20

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) .............................................................................3

*Crawford v. Marion Cty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008).........................5, 6, 10

*Curling v. Kemp*,
  334 F. Supp. 3d 1303 (N.D. Ga. 2018) ...............................................................20

*Democratic Nat'l Comm. v. Hobbs*,
  948 F.3d 989 (9th Cir. 2020) .................................................................................6

*Democratic Nat'l Comm. v. Reagan*,
  329 F. Supp. 3d 824 (D. Ariz.), *aff'd*, 904 F.3d 686 (9th Cir. 2018),
  *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019), *rev'd on*
  *other grounds and remanded sub nom. Democratic Nat'l Comm. v.*
  *Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc)................................................10

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Democratic Party of Ga., Inc. v. Crittenden,*
   347 F. Supp. 3d 1324 (N.D. Ga. 2018)......................................................6, 10, 20

*E. A. Renfroe & Co. v. Moran,*
   249 Fed. Appx. 88 (11th Cir. 2007)................................................................3, 4

*Elec. Privacy Info. Ctr. v. United States DOC,*
   928 F.3d 95 (D.C. Cir. 2019)...............................................................................4

*Fair Fight Action, Inc. v. Raffensperger,*
   413 F. Supp. 3d 1251 (N.D. Ga. 2019)..............................................................20

*Fla. Democratic Party v. Hood,*
   342 F. Supp. 2d 1073 (N.D. Fla. 2004)..........................................................7, 10

*Fla. Democratic Party v. Scott,*
   215 F. Supp. 3d 1250 (N.D. Fla. 2016)........................................................6, 7, 10

*Fla. State Conf. of the NAACP v. Browning,*
   522 F.3d 1153 (11th Cir. 2008)...........................................................................7

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
   344 F.3d 1263 (11th Cir. 2003)........................................................................15

*Foman v. Davis,*
   371 U.S. 178 (1962).........................................................................................21

*Grizzle v. Kemp,*
   634 F.3d 1314 (11th Cir. 2011)........................................................................19

*Hancock Cty. Bd. of Sup'rs v. Ruhr,*
   487 F. App'x 189 (5th Cir. 2012).......................................................................7

*Heart 6 Ranch, LLC v. Zinke,*
   285 F. Supp. 3d 135 (D.D.C. 2018)....................................................................4

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977)...........................................................................................6

*Jacobson v. Florida Secretary of State,*
   No. 19-14552, 2020 WL 2049076 (11th Cir. Apr. 29, 2020).....................passim

# TABLE OF AUTHORITIES

**CASES**                                                                           **PAGE(S)**

*Jacobson v. Lee*,
　411 F. Supp. 3d 1249 (N.D. Fla. 2019) ........................................................passim

*LaRoque v. Holder*,
　650 F.3d 777 (D.C. Cir. 2011)...............................................................13

*Loggerhead Turtle v. Cty. Council of Volusia Cty.*,
　148 F.3d 1231 (11th Cir. 1998) ...................................................15, 16

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992)...............................................................3, 4, 15

*Owen v. Mulligan*,
　640 F.2d 1130 (9th Cir. 1981) ...........................................................13

*Purcell v. Gonzalez*,
　549 U.S. 1 (2006)....................................................................9

*Republican Party of N.M. v. Herrera*,
　No. 06-0834-MLB, 2006 WL 8443574, (D.N.M. Oct. 11, 2006).....................10

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
　547 U.S. 47 (2006)....................................................................2

*Sandusky Cty. Democratic Party v. Blackwell*,
　387 F.3d 565 (6th Cir. 2004) ...........................................................10

*Schiaffo v. Helstoski*,
　492 F.2d 413 (3d Cir. 1974) ...........................................................13

*Summers v. Earth Island Institute*,
　555 U.S. 488, 499 (2009).................................................................10

*Tex. Democratic Party v. Benkiser*,
　459 F.3d 582 (5th Cir. 2006) ...................................................10, 12

*United States v. Archer*,
　531 F.3d 1347 (11th Cir. 2008) .........................................................20

iii

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

**STATUTES**

52 U.S.C. § 30101(14) ...........................................................................................6

Florida Statute § 99.121 .......................................................................................16

O.C.G.A. § 21-2-31(1) ........................................................................................17

O.C.G.A. § 21-2-31(5) ........................................................................................18

O.C.G.A. § 21-2-32(a) ........................................................................................17

O.C.G.A. § 21-2-33 ............................................................................................18

O.C.G.A. § 21-2-33.1(a), (1-6) ...........................................................................18

O.C.G.A. § 21-2-50(15) ......................................................................................17

O.C.G.A. § 21-2-50(a)(1) ....................................................................................16

O.C.G.A. § 21-2-369(c) .......................................................................................17

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure Rule 15(a)(2) ....................................................21

Local Rule 5.1 ......................................................................................................1

Federal Rules of Civil Procedure Rule 12(b)(1) .....................................................7

## INTRODUCTION

On April 29, 2020, the Eleventh Circuit issued its ruling in *Jacobson v. Florida Secretary of State*, holding that the plaintiffs in that case had failed to establish Article III standing. No. 19-14552, 2020 WL 2049076 (11th Cir. Apr. 29, 2020). Notably, *Jacobson* did not reach the merits of the underlying challenge to Florida's ballot order statute—which, like Georgia's Ballot Order Statute, awards first position on the ballot to all candidates affiliated with the governor's political party—or address the district court's holding that "[b]y systematically awarding a statistically significant advantage to the candidates of the party in power, Florida's ballot order scheme takes a side in partisan elections." *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1268, 1277 (N.D. Fla. 2019).

Two days later, this Court directed Plaintiffs to file a supplemental brief "addressing the impact of the Eleventh Circuit's decision in *Jacobson* . . . on their claims and their pending Motion for Preliminary Injunction and Defendants' Motion to Dismiss." Doc. 54 at 1-2. That impact is zero. Even if *Jacobson* were correct on the applicable law and factual record in that case (and Plaintiffs maintain it was not), it does not guide this Court's determination in this case for two main reasons. First, *Jacobson*'s standing determination was based on an evaluation of the plaintiffs' evidence of their alleged injuries after a full trial. This case, by contrast, is at a preliminary, pre-discovery stage, with pending motions to dismiss and for a preliminary injunction. Plaintiffs have sufficiently established that they have standing (including to meet the criteria endorsed by the court in *Jacobson*) to more

than suffice at this stage in these proceedings. Second, *Jacobson*'s alternative holding on standing explicitly hinged on the *Florida* Secretary of State's authority under *Florida* law. The authority conferred upon the Georgia Secretary of State (the "Secretary") and the members of the State Election Board, by contrast, is defined by *Georgia* law, which unequivocally gives those officials power to enforce the Ballot Order Statute. Thus, the redressability/traceability concerns that the *Jacobson* court found problematic there are not at issue here.

Because *Jacobson* does not foreclose their relief, Plaintiffs respectfully request that this Court grant their pending motion for preliminary injunction, Doc. 22, and deny Defendants' motion to dismiss, Doc. 37.

## ARGUMENT

Plaintiffs have established standing to challenge Georgia's unconstitutional Ballot Order Statute, and nothing in *Jacobson* alters this conclusion. While only one plaintiff need have standing for a case to proceed, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006), here all nine Plaintiffs have met the requirements to establish they have standing at this pre-discovery phase of litigation. Plaintiffs have both alleged sufficient facts to establish standing in their pleading, *see* Doc. 17 ¶¶ 15–23, and reinforced it through subsequent declarations in support of their motion for preliminary injunction, *see* Doc. 24, Exs. D, E, F, G; *see also* Doc. 41.

I.    **The standard of proof to establish standing at trial is different than the standard of proof at the pleading and preliminary injunction stages.**

Courts apply a lower evidentiary bar to prove standing at preliminary stages of litigation than after a full trial. Accordingly, *Jacobson*'s standing determination, based on the trial record and specific evidence presented in that case, has no bearing on whether Plaintiffs have established standing in the present case, either in their Amended Complaint or in their motion for preliminary injunction.

Each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009); *see also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media et. al.*, No. 18-1171, 140 S.Ct. 1009, 1014 (2020) (noting that, while the essential elements of a claim remain constant through the life of a lawsuit, "[w]hat a plaintiff must do to satisfy those elements may increase as a case progresses from complaint to trial"). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"). The same standard applies at the preliminary injunction stage to satisfy standing. *See, e.g.*, *E. A. Renfroe & Co. v. Moran*, 249 Fed. Appx. 88, 91 (11th Cir.

2007) ("By pleading the breach of a contractual provision, Renfroe asserted a sufficient 'injury in fact' for standing."); *see also City & Cty. of San Francisco v. U.S. Dep't of Homeland Sec.*, 944 F.3d 773, 787 (9th Cir. 2019) (explaining that at the preliminary injunction stage, "plaintiffs may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden"). By contrast, in order to ultimately prevail "[a]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561 (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 (1979)).[1]

*Jacobson* itself recognized that different standards of proof apply to different stages of litigation. 2020 WL 2049076, at *8. Thus, its ruling regarding the specific evidence of standing in that case, after a full trial and a final decision on the merits, has no bearing on whether Plaintiffs have established standing based on the

---

[1] Even if the Court were to apply a standard on preliminary injunction that is higher than the standard applied on a motion dismiss, the burden on Plaintiffs to establish standing is still less than their burden to prove standing at trial. *See, e.g.*, *Elec. Privacy Info. Ctr. v. United States DOC*, 928 F.3d 95, 104 (D.C. Cir. 2019) (requiring plaintiffs to prove a "substantial likelihood of standing" at the preliminary injunction stage) (citation omitted); *Heart 6 Ranch, LLC v. Zinke*, 285 F. Supp. 3d 135, 139 (D.D.C. 2018) ("Plaintiff has shown at least a 'substantial likelihood' of standing, as is required for the issuance of a preliminary injunction."); *cf. Church v. City of Huntsville*, 30 F.3d 1332, 1336, n.1 (11th Cir. 1994) (pre-dating *Moran* and judging plaintiffs' standing for preliminary injunction purposes "on the sufficiency of the allegations of the complaint" while "leav[ing] for another day a determination of the degree of evidence necessary to support standing" at that stage when standing is contested).

4

allegations (as well as additional evidence) presented at a preliminary stage in *this* case, where there has been neither discovery nor a trial.

## II.   Plaintiffs have established injury in fact.

Plaintiffs have sufficiently met their burden to prove injury in fact to challenge the Ballot Order Statute at this stage under multiple legal theories, none of which are foreclosed by *Jacobson*.

***First***, the political party Plaintiffs have sufficiently pled and further established associational standing at this stage of the litigation. The *Jacobson* court held that the plaintiffs in that case did not have associational standing because five of the six entities failed to allege that they have members, and the single plaintiff that did failed to identify a specific member who was injured by the ballot order statute. *Jacobson*, 2020 WL 2049076, at *7. Here, by contrast, the political party Plaintiffs, DNC Services Corp./Democratic National Committee ("DNC"), DSCC, DCCC, and the Democratic Party of Georgia ("DPG"), have alleged and submitted evidence that they have associational standing because the Ballot Order Statute injures their members or member-equivalents, several of whom have been specifically identified.

It is well established that a political party has associational standing based on its voter and candidate members. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding state Democratic Party had associational standing to bring claims of its voters injured by voter ID law), *aff'd* 553 U.S. 181,

189 n.7 (2008) ("We also agree with the unanimous view of those judges that the Democrats have standing to challenge the validity of [the voter ID law] . . . ."); *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (holding Florida Democratic Party had associational standing to bring claims on behalf of their voter members) (citing *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078–79 (N.D. Fla. 2004)).[2]

    *Jacobson*'s holding that the plaintiffs there failed to identify specific members at trial who would be harmed by Florida's ballot order statute, 2020 WL 2049076,

---

[2] Whether the political party Plaintiffs' candidates and voters are officially designated "members" is irrelevant. Binding Supreme Court precedent—which the *Jacobson* decision does not address—establishes that the fact that an organization is not "a traditional voluntary membership organization" does not preclude it from asserting associational standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Like the state agency at issue in *Hunt*, Plaintiffs DNC, DSCC, and DCCC "perform[] the functions" of a membership organization by "provid[ing] the means by which" Democratic candidates and voters "express their collective views and protect their collective interest." *Id.* at 345; *see also* Doc. 17 ¶¶ 19–21; Doc. 24-5 ¶ 6; Doc. 24-6 ¶¶ 2, 4; Doc. 24-7 ¶ 2. As the three federally recognized party committees of the Democratic Party under 52 U.S.C. § 30101(14), these Plaintiffs have associational standing to represent the interests of Democratic candidates as well as Democratic voters, even if those candidates and voters are not called "members." *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 999 (9th Cir. 2020) (holding Arizona law which burdens voters unconstitutional in case brought byDNC, DSCC, and the Arizona Democratic Party). Any suggestion otherwise contradicts the Supreme Court's admonition in *Hunt* not to "exalt form over substance" when considering members and membership for associational standing. 432 U.S. at 345. In any event, both DNC and DPG are undisputedly membership organizations. *See Jacobson*, 2020 WL 2049076, at *7; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018); Doc. 17 ¶¶ 19, 22; Doc. 24-5 ¶¶ 20-21; 24-8 ¶¶ 13, 14.

at *7, does not foreclose finding Plaintiffs' standing here on a preliminary injunction. When evaluating motions for preliminary injunction, courts have held that political parties have associational standing *even without* identifying a specific voter member who will be harmed in the next election by the challenged conduct. *See, e.g.*, *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) (holding, in examining a preliminary injunction motion, that plaintiffs had associational standing even when they could not identify specific voter members who will be harmed in the upcoming election); *Scott*, 215 F. Supp. 3d at 1254 (finding "political parties have standing to assert, at least, the rights of its members who will vote in an upcoming election," "even though the political party could not identify *specific* voters that would be affected"); *Hood*, 342 F. Supp. 2d at 1079 (finding political party had standing even though it "has not identified specific voters" who would be harmed by challenged election law); *see also Hancock Cty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."); *Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) (noting there is no authority "that supports the proposition that an association must 'name names' in a complaint in order properly to allege injury in fact to its members"). So, too, here, the political party Plaintiffs need not identify a specific member who will be harmed by the Ballot Order Statute

7

in the 2020 election to obtain preliminary injunctive relief. It is enough that they have alleged (and indeed provided evidence) that their members will be placed at a significant disadvantage because of the uneven playing field that the Ballot Order Statute creates. Doc. 17 ¶ 22; Doc. 24-5 ¶¶ 19–21; Doc. 24-6 ¶¶ 6–7; Doc. 24-7 ¶¶ 6–7; Doc. 24-8 ¶¶ 3, 13.

Nevertheless, as noted above, Plaintiffs *have* identified individual members or member-equivalents who will be directly harmed in the coming election if the Ballot Order Statute remains in place. DNC identified eight formal members, four of whom are elected officials and candidates for public office in Georgia, who will be injured by the Ballot Order Statute. *See* Doc. 24-5 ¶ 6; *see also*, Ga. Democratic Party, *Party Leadership*, https://www.georgiademocrat.org/leadership/ (last visited May 15, 2020) (identifying Georgia elected officials State Senator Nikema Williams, State Senator Sheikh Rehman, State Representative Pamela Stephenson, and Clarkston Mayor Ted Terry as "DNC members," three of whom will be running for re-election in 2020 and one, Ted Terry, running for county-level office, Greg Bluestein, *He Plans to Run for a DeKalb County Commissioner's Seat Instead*, ATLANTA JOURNAL CONSTITUTION (Jan. 26, 2020), https://www.ajc.com/blog/politics/clarkston-millennial-mayor-drops-out-georgia-senate-race/q40GlcKJBKKj7ufNHiMwNJ/). DSCC identified the "Democrat[] running to represent Georgia in the U.S. Senate" in 2020 as a specific candidate who will be harmed by the Ballot Order Statute. Doc. 24-6 ¶¶ 6-7, 10; Doc. 17 ¶ 20

(same). DCCC identified the Democratic candidates for Georgia's 6th and 7th congressional districts as specific candidates who will be harmed by the Ballot Order Statute in the 2020 election. Doc. 24-7 ¶¶ 10-11; *see also* Doc. 24-2 at 5. The primary election that will result in the selection of those candidates is scheduled to take place on June 9, with runoffs scheduled for August 11 if no one receives a majority of the vote. But the fact that those standard bearers have yet to be selected does not negate the fact that Plaintiffs have specifically identified persons among their membership who will be directly injured by the Statute if it remains in operation in the November election.[3]

DPG, moreover, is indisputably a membership organization, whose members include candidates up and down the ticket in the 2020 election. *See Party Leadership*, Ga. Democratic Party, https://www.georgiademocrat.org/leadership/ (identifying candidates for state and federal office as members). Once again, the fact that the specific nominees for every office will not be known until the June 9 primary does not negate DPG's associational standing to represent its candidates; DPG is not only *likely* to be able to identify them by name after the primary, it is certain to.

---

[3] The names of the candidates who are running for the nomination for these offices are public record, and they include, among others, Carolyn Bourdeaux, who previously lost her bid to represent Georgia's 7th congressional district in 2018 by a mere 433 votes, or 0.14 percentage points. Doc. 24-7 ¶ 10. If Plaintiffs could not bring this action until the candidates for these races were identified through the primary process, which may not end until August, they would almost certainly find their relief for request foreclosed. *See Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). The identification of candidates by the office they will run for more than sufficiently meets the standard that Plaintiffs must show for standing at this stage.

Indeed, *every* member of the DPG has their associational interests injured by the systematic favoring of Republicans in Georgia up and down the ballot, negating the necessity to identify specific members at *any* stage of the litigation. *See Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009) (holding there is no requirement to identify individual members for associational standing where all members of an organization are injured). Not only has this Court specifically held that DPG has associational standing on behalf of its voter members, *see Crittenden*, 347 F. Supp. 3d at 1337 (holding DPG had associational standing because "it is extremely unlikely that the rejection of absentee ballots and the curative process for handling provisional ballots will not affect a single Democratic Party member"), courts have routinely held that state parties have associational standing on behalf of both their voters and their affiliated candidates. *See, e.g.*, *Crawford*, 472 F.3d at 95, *aff'd* 553 U.S. at 189 n.7; *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004); *Crittenden*, 347 F. Supp. 3d at 1337; *Scott*, 215 F. Supp. 3d at 1254; *Hood*, 342 F. Supp. 2d at 1078–79; *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 831 (D. Ariz.), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *reh'g en banc granted*, 911 F.3d 942 (9th Cir. 2019), *rev'd on other grounds and remanded sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc); *Republican Party of N.M. v. Herrera*, No. 06-0834-MLB, 2006 WL 8443574, at *4

10

(D.N.M. Oct. 11, 2006); *Bay County Democratic Party v. Land*, 347 F. Supp. 2d 404, 422 (E.D. Mich. 2004).

**Second**, while the Eleventh Circuit held that the organizational plaintiffs in *Jacobson* had not "explained what activities [they] would divert resources away *from* in order to spend additional resources on combatting the primacy effect" at trial, *Jacobson*, 2020 WL 2049076 at *9, here, at the preliminary injunction and motion to dismiss stage, organizational Plaintiffs have sufficiently alleged that they have suffered—and will continue to suffer—their own injuries because the Ballot Order Statute requires them to divert their limited resources "away *from*" other states *to* Georgia. Priorities USA, for instance, must divert funds from its efforts to persuade and mobilize voters in other states to combat the Ballot Order Statute's effects in Georgia. Doc. 17 ¶ 23. Further, the DNC must commit *more* resources to Georgia than it would otherwise have to absent the Ballot Order Statute. *Id.* ¶ 19; *see also* Doc. 24-5 ¶¶ 18–19. As a result, the DNC spends fewer dollars in the other states in which it competes to elect Democrats. Similarly, the DSCC and DCCC, which work to elect Democratic candidates for U.S. Senate and U.S. House across the country, make decisions to allocate funds from a certain amount of money to support candidates. Doc. 24-6 ¶ 8; Doc. 24-7 ¶ 9. By having to spend more money to support candidates in Georgia—candidates who face systemic disadvantages from the Ballot Order Statute—the DSCC and the DCCC will have less money to support Senate or congressional candidates in other districts or states. Doc. 24-7 ¶ 13; *see*

11

*also* Doc. 24-7 ¶¶ 12, 14 ("[B]ecause of Georgia's Ballot Order Statute, DCCC will have to commit even more resources to races in Georgia than it would otherwise have to . . . [and] if DCCC diverts those additional resources to Georgia, it will have less resources to support other Democratic candidates in races all across the country."). To the extent *Jacobson* requires more precise details about activities or programs the organizational Plaintiffs would implement in other states if it did not have to divert resources to combatting the Ballot Order Statute in Georgia, those details will necessarily be developed in the course of discovery and at trial. At the current stage, however, organizational Plaintiffs' allegations and declarations make clear that Plaintiffs have to divert resources away from their expenditures in other states to spend more in Georgia as a result of the Ballot Order Statute.

*Third*, the political party Plaintiffs have standing based on the direct threat of injury that the Ballot Order Statute poses to their candidates' electoral prospects in the upcoming 2020 election— a basis for standing that *Jacobson* explicitly did not consider, 2020 WL 2049076, at *9. Here, in contrast to *Jacobson*, Plaintiffs point to specific candidates—for example, the Democratic candidate for the non-special U.S. Senate election in Georgia in 2020—who will face electoral harm because their Republican opponents will start with an electoral advantage due to the Ballot Order Statute. *See* Doc. 17 ¶ 20; Doc. 24-6 ¶¶ 6-7, 10. Like other circuit courts have recognized, harm to a candidate's electoral prospects is sufficient to establish Article III injury on behalf of the candidate's political party. *See, e.g.*, *Tex. Democratic*

*Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (recognizing "harm to its election prospects" as an injury in fact for the Texas Democratic Party's standing); *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981) (finding standing for Republican committee members where "they seek to prevent their opponent from gaining an unfair advantage in the election process"); *see also LaRoque v. Holder,* 650 F.3d 777, 786 (D.C. Cir. 2011) (finding standing where candidate alleged that the partisan-elections system "injures him by providing a competitive advantage to his Democratic opponents," noting "we have held that such competitive injuries in the electoral arena can confer Article III standing"); *Schiaffo v. Helstoski*, 492 F.2d 413, 422 (3d Cir. 1974) ("[I]t may properly be contended that the damage []allegedly unauthorized mailings caused [a candidate's] electoral prospects constitutes a noneconomic harm."). This Court should similarly find political party Plaintiffs have an injury sufficient for Article III standing based on harm to their candidates' electoral prospects.

Finally, while *Jacobson* faulted the plaintiffs for failing to show the "existence or size of the primacy effect in any given election," *Jacobson*, 2020 WL 2049076, at *6, there is little question that Plaintiffs allege and even provide evidence here that particular candidates will be harmed by the Ballot Order Statute in the 2020 election, which is all that is required at the preliminary injunction stage to obtain relief. This includes, but is not limited to, the Democratic nominee to the non-special U.S. Senate in the 2020 election, *see* Doc. 17 ¶ 20 *and* Doc. 24-6 ¶ 10,

13

a race that public polling demonstrates is likely to fall well within the average 4.2 percentage point advantage conferred upon first-listed candidates in Georgia partisan elections, *see, e.g.*, Greg Bluestein, *A New Internal GOP Poll Suggests Tight Prez, Senate Races in Georgia*, ATLANTA JOURNAL CONSTITUTION (May 13, 2020), https://www.ajc.com/blog/politics/new-internal-gop-poll-suggests-tight-prez-senate-races-georgia/VUuh6VQLw7SJVSMEfvGC5L/ (describing polling data finding "U.S. Sen. David Perdue led Democratic frontrunner Jon Ossoff by a 43-41 margin"); Doc. 24-2 at 5 (estimating that the Ballot Order Statute provides an average advantage of 4.2 percentage points in Georgia); *see also* Doc. 24-3 at 15 (explaining that in a U.S. Senate election, the candidate listed first on the ballot received a 6.24 percentage point advantage).

Thus, nothing in *Jacobson*'s evaluation of that case's trial record precludes a finding that Plaintiffs *here* have established an injury-in-fact sufficient for and commensurate with the procedural posture in this case.[4]

### III.  Plaintiffs' injuries are traceable to and redressable by the Secretary and the State Election Board.

Regardless of *Jacobson*'s interpretation of the authority conferred upon the Florida Secretary of State, Plaintiffs' injuries in this case are traceable to and

---

[4] To the extent the Court finds it would benefit from a supplemental record on standing in light of *Jacobson*, notwithstanding the difference in the procedural posture between *Jacobson* and the present case, Plaintiffs seek leave to submit supplemental declarations to provide more details, for instance, regarding how they divert resources or to name specific candidates who will be harmed by the Ballot Order Statute after the State's primary.

redressable by the Georgia Secretary of State and the members of the State Election Board. *Jacobson* held that plaintiffs' injuries stemming from Florida's ballot order statute were neither traceable to nor redressable by the Florida Secretary of State because state law charged the county supervisors of election with implementing the ballot order statute. 2020 WL 2049076, at *9. The *Jacobson* court made clear that its holding turned on *Florida*-specific law governing the power (or lack thereof) of the Florida Secretary of State to determine ballot order. *Georgia* law, however, gives the Secretary and the State Election Board significantly more power over the Ballot Order Statute, and both the Eleventh Circuit and Georgia district courts have consistently recognized these officials' authority over the state's election laws.

Under well-established standing law, a plaintiff's injury must be "fairly . . . traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (alterations adopted) (quotation marks omitted). Put another way, a plaintiff must show a "causal connection"—which is "something less than . . . proximate cause"— between its injuries and the challenged conduct. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). This standard can be met "even [with] harms that flow indirectly from the action in question." *Id.* While the challenged conduct must "not [be] the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (alterations adopted) (quotation marks omitted), standing "is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead*

15

*Turtle v. Cty. Council of Volusia Cty.*, 148 F.3d 1231, 1247 (11th Cir. 1998). And, to prove redressability, a plaintiff must show that it is "likely, as opposed to merely speculative" that the hypothetical injury would "be redressed by a favorable decision" against the defendant. *Id.* at 1253 (quotation marks omitted).

Under the prevailing standard, this case is distinguishable from *Jacobson* for at least three reasons. ***First***, Georgia law does not mirror Florida law with respect to the authority of local election officials. In *Jacobson*, the court found that the supervisors of elections have independent and exclusive authority over ballot order based on Florida Statute § 99.121, which provides that "[t]he names of [candidates] shall be printed by the supervisor of elections upon the ballot in their proper place as provided by law." 2020 WL 2049076, at *9. But even if that were a fair reading of Florida law, it bears no resemblance to Georgia law, which has no provision that gives local officials independent and exclusive authority over the Ballot Order Statute.

***Second***, the role that high-ranking state election officials play in ballot order in Florida is different than in Georgia. While the *Jacobson* court concluded that the Florida Secretary of State "plays [no] role in determining the order in which candidates appear on ballots," *id.*, *see also id.* at *21, Georgia law specifically charges the Secretary and State Election Board with determining ballot order. In particular, the Secretary is charged with developing the form of the ballot and reviewing the ballots to be used by counties and municipalities. *See, e.g.*, O.C.G.A.

§ 21-2-50(a)(1) (requiring Secretary "[t]o determine the forms of. . . ballots"); *id.* at (9) (requiring Secretary "[t]o determine and approve the form of ballots for use in special elections"); O.C.G.A. § 21-2-369(c) ("The form and arrangement of ballots *shall be prescribed* by the Secretary of State and prepared by the superintendent.") (emphasis added); O.C.G.A. § 21-2-50(15) (requiring the Secretary "[t]o develop, program, build, and review ballots for use by counties and municipalities. . . ."). And the State Election Board, of which the Secretary is the Chair, is charged with "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all. . . elections." O.C.G.A. § 21-2-31(1).

**Third**, the Georgia Secretary and State Election Board have more enforcement authority to ensure compliance with the Ballot Order Statute than the Florida Secretary of State. The *Jacobson* court concluded that the Florida Secretary of State lacked sufficient enforcement power because her "only means of control" over county supervisors who fail to comply with the ballot order statute "is through coercive judicial process." 2020 WL 2049076, at *10 ("That the Secretary must resort to judicial process if the Supervisors fail to perform their duties underscores her lack of authority over them."). The State Election Board, by contrast, of which the Secretary is the Chair, is specifically charged with the duty to investigate potential violations of and "to *compel compliance*" with the State's election laws

through the Board's *own* orders, as well as by court action. O.C.G.A. § 21-2-32(a) (emphasis added); *see also* O.C.G.A. § 21-2-33.1(a), (1-6) ("The State Election Board is vested with the power to issue orders, after the completion of appropriate proceedings, directing compliance with this chapter or prohibiting the actual or threatened commission of any conduct constituting a violation[.]"); *id.* (empowering State Election Board to issue orders requiring those who violate state election laws "[t]o cease and desist from committing further violations" and "[t]o pay a civil penalty" for each violation "as the State Election Board deems appropriate," and further empowering the Board "[t]o publicly reprimand any violator," "[t]o require that restitution be paid by any violator" where monetary loss has been suffered as a result of a violation, "[t]o require violators to attend training as specified by the board," and "[t]o assess investigative costs incurred by the board against any violator found to have committed a violation"); O.C.G.A. § 21-2-33 (explaining how State Election Board conducts investigations into potential violations of law); O.C.G.A. § 21-2-31(5) (charging the State Election Board with the power "[t]o investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of. . . election laws. . . in. . . elections and to report violations of the. . . election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution"). Indeed, the State Election Board frequently exercises its enforcement authority to ensure compliance with state election laws. *See, e.g.*, *State Sanctions Clarke Bd. for*

18

*Violating    Uniform    Voting    Law*,    GA.    SEC'Y    OF    STATE,
https://sos.ga.gov/index.php/elections/state_sanctions_clarke_board_for_violating_
uniform_voting_law (last accessed May 15, 2020) ("The State Elections Board [sic]
sanctioned the Clarke County Board of Elections after a hearing [on March 11, 2020]
for violating Georgia law requiring uniform voting.").

The Eleventh Circuit has already recognized the broad enforcement power
and duties that the Georgia Secretary and State Election Board have over local
election officials. In *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), a suit seeking
to enjoin a nepotism statute that barred certain individuals from running for office,
the Eleventh Circuit explained, in examining sovereign immunity,  that, "[a]lthough
the Secretary of State cannot directly qualify or challenge candidates for local boards
of education or certify the results of those elections [like local officials can], as a
member and the chairperson of the State Election Board, *he has both the power and
the duty to ensure that the entities* charged with those responsibilities *comply with
Georgia's election code* in carrying out those tasks." *Id.* at 1319 (emphasis added).
The Court held that the Secretary's "power by virtue of his office. . . connect[s] him
with the duty of enforcement." *Id.*

Given the significant power of the Secretary and the State Election Board, it
is no surprise that the Eleventh Circuit and this Court have repeatedly held that
election injuries were "fairly traceable" to and/or redressable by them. *See, e.g.*,
*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)

(holding plaintiffs' injuries—i.e. the denial of voter registration applications—were "fairly traceable" to the actions of the Georgia Secretary); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D. Ga. 2019) (finding plaintiffs' injuries stemming from a voter purge statute were traceable to and redressable by the Secretary and members of the State Election Board); *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1291 (N.D. Ga. 2018) (holding a court ruling against the Georgia Secretary "can redress Plaintiff's [voter registration] injuries"); *Crittenden*, 347 F. Supp. 3d at 1338 ("An injunction directed at the Secretary of State addressing election procedures can reduce Plaintiffs' burden of assisting voters."); *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1318 (N.D. Ga. 2018) (rejecting argument that "that an injunction prohibiting the [Georgia Secretary] from using [a certain type of voting machine] would not actually stop [its] deployment" because county officials were not defendants in the suit and could continue to use the voting machines).

In sum, it would far overread *Jacobson*'s holding with respect to the statutory powers conferred upon the *Florida* Secretary of State by *Florida* law to find that the Georgia Secretary and State Election Board are not the proper defendants here, applying Georgia law and the broad body of precedent discussed above. As a three-judge panel of the Eleventh Circuit, the *Jacobson* court lacked the power to overrule the circuit's prior decisions in this regard, *see United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by

the Supreme Court or by this court sitting *en banc*."), and it gave no indication that it intended to effect a sea change in the law across the circuit, regardless of the relevant state provisions at issue in each case. For all of the reasons discussed, Plaintiffs' injuries are traceable to and redressable by the Secretary and members of the Georgia State Election Board.[5]

## CONCLUSION

For the above-stated reasons, Plaintiffs respectfully submit that the Eleventh Circuit's opinion in *Jacobson* holding that the plaintiffs lacked standing in that case is distinguishable from the allegations, evidence, posture, and applicable law in this case, and does not undermine the strong grounds for standing established by

---

[5] If the Court disagrees with Plaintiffs and finds that their injuries are neither traceable to nor redressable by the Secretary and State Election Board, Plaintiffs seek leave to file a Second Amended Complaint to add local election officials as defendants. Federal Rule of Civil Procedure Rule 15(a)(2) provides that courts "should freely give leave when justice so requires," And courts exercise their discretion to grant leave to amend except in instances of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of these factors apply here. Far from engaging in any undue delay, Plaintiffs moved for a preliminary injunction three days after filing their Amended Complaint. Any need to amend to add at least 159 local election officials would result solely from the Eleventh Circuit's opinion in *Jacobson*, not from any bad faith or dilatory motive on the part of Plaintiffs. Finally, granting leave to amend will not be futile, as *Jacobson* explicitly holds that plaintiffs could have and should have sued local elections officials. *Jacobson*, 2020 WL 2049076, at *14.

Plaintiffs here. This Court should grant Plaintiffs' motion for preliminary injunction and deny the Defendants' motion to dismiss.

Dated: May 15, 2020                          Respectfully submitted,

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
One Atlantic Center
1201 W. Peachtree St., NW, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Elisabeth C. Frost*
Jacki L. Anderson*
Zachary J. Newkirk*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
jackianderson@perkinscoie.com
znewkirk@perkinscoie.com

Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
akhanna@perkinscoie.com

*Counsel for Plaintiffs*
*\*Admitted Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: May 15, 2020

**Adam M. Sparks**
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: May 15, 2020

<u>**Adam M. Sparks**</u>
*Counsel for Plaintiffs*